# HOLT CIVIC CLUB ET AL. *v.* CITY OF TUSCALOOSA ET AL.

No. 77–515.  Argued October 11, 1978—Decided November 28, 1978

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post,* p. 75. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post,* p. 79.

*Edward Still* argued the cause for appellants. With him on the briefs were *Neil Bradley, Laughlin McDonald, Christopher Coates,* and *Bruce Ennis.*

*J. Wagner Finnell* argued the cause and filed a brief for appellees.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Holt is a small, largely rural, unincorporated community located on the northeastern outskirts of Tuscaloosa, the fifth largest city in Alabama. Because the community is within the three-mile police jurisdiction circumscribing Tuscaloosa's corporate limits, its residents are subject to the city's "police [and] sanitary regulations." Ala. Code § 11–40–10 (1975).[1] Holt residents are also subject to the criminal jurisdiction of the city's court, Ala. Code § 12–14–1 (1975),[2] and to the city's

---

[1] The full text of § 11–40–10 provides:

"The police jurisdiction in cities having 6,000 or more inhabitants shall cover all adjoining territory within three miles of the corporate limits, and in cities having less than 6,000 inhabitants and in towns, such police jurisdiction shall extend also to the adjoining territory within a mile and a half of the corporate limits of such city or town.

"Ordinances of a city or town enforcing police or sanitary regulations and prescribing fines and penalties for violations thereof shall have force and effect in the limits of the city or town and in the police jurisdiction thereof and on any property or rights-of-way belonging to the city or town."

[2] "The municipal court shall have jurisdiction of all prosecutions for

power to license businesses, trades, and professions, Ala. Code § 11–51–91 (1975).[3] Tuscaloosa, however, may collect from businesses in the police jurisdiction only one-half of the license fee chargeable to similar businesses conducted within the corporate limits. *Ibid.*

In 1973 appellants, an unincorporated civic association and seven individual residents of Holt, brought this statewide class action in the United States District Court for the Northern District of Alabama,[4] challenging the constitutionality of these Alabama statutes. They claimed that the city's extraterritorial exercise of police powers over Holt residents, without a concomitant extension of the franchise on an equal footing with those residing within the corporate limits, denies resi-

---

the breach of the ordinances of the municipality within its police jurisdiction." Ala. Code § 12–14–1 (b) (1975).

[3] In pertinent part § 11–51–91 provides:

"Any city or town within the state of Alabama may fix and collect licenses for any business, trade or profession done within the police jurisdiction of such city or town but outside the corporate limits thereof; provided, that the amount of such licenses shall not be more than one half the amount charged and collected as a license for like business, trade or profession done within the corporate limits of such city or town, fees and penalties excluded . . . ."

Although not at issue here, Ala. Code § 11–52–8 (1975) imposes a duty on the municipal planning commission "to make and adopt a master plan for the physical development of the municipality, including any areas outside of its boundaries which, in the commission's judgment, bear relation to the planning of such municipality." Under Ala. Code §§ 11–52–30 and 11–52–31 (1975), also not contested here, the municipal planning commission is required to adopt regulations governing the subdivision of land within its jurisdiction, which includes all land lying within five miles of the municipality's corporate limits and not located within the corporate limits of any other municipality.

[4] This suit was instituted prior to the 1975 recompilation of the Alabama Code. Other than minor stylistic changes, § 11–40–10 and § 11–51–91 are identical to their predecessors, Ala. Code, Tit. 37, §§ 9 and 733 (1958) respectively. Section 12–14–1 abolished the recorder's courts created under is predecessor, Ala. Code, Tit. 37, § 585 (1958), and replaced them with municipal courts having similar extraterritorial jurisdiction.

dents of the police jurisdiction rights secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The District Court denied appellants' request to convene a three-judge court pursuant to 28 U. S. C. § 2281 (1970 ed.) and dismissed the complaint for failure to state a claim upon which relief could be granted. Characterizing the Alabama statutes as enabling Acts, the District Court held that the statutes lack the requisite statewide application necessary to convene a three-judge District Court. On appeal the Court of Appeals for the Fifth Circuit ordered the convening of a three-judge court, finding that the police jurisdiction statute embodies " 'a policy of statewide concern.' " *Holt Civic Club* v. *Tuscaloosa,* 525 F. 2d 653, 655 (1975), quoting *Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89, 94 (1935).

A three-judge District Court was convened, but appellants' constitutional claims fared no better on the merits. Noting that appellants sought a declaration that extraterritorial regulation is unconstitutional *per se* rather than an extension of the franchise to police jurisdiction residents, the District Court held simply that "[e]qual protection has not been extended to cover such contention." App. to Juris. Statement 2a. The court rejected appellants' due process claim without comment. Accordingly, appellees' motion to dismiss was granted.

Unsure whether appellants' constitutional attack on the Alabama statutes satisfied the requirements of 28 U. S. C. § 2281 (1970 ed.) for convening a three-judge district court, we postponed consideration of the jurisdictional issue until the hearing of the case on the merits. 435 U. S. 914 (1978). We now conclude that the three-judge court was properly convened and that appellants' constitutional claims were properly rejected.

I

Before its repeal,[5] 28 U. S. C. § 2281 (1970 ed.) required that a three-judge district court be convened in any case in

---

[5] Pub. L. 94–381, § 1, Aug. 12, 1976, 90 Stat. 1119.

which a preliminary or permanent injunction was sought to restrain "the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute . . . ." Our decisions have interpreted § 2281 to require the convening of a three-judge district court "where the challenged statute or regulation, albeit created or authorized by a state legislature, has statewide application or effectuates a statewide policy." *Board of Regents* v. *New Left Education Project*, 404 U. S. 541, 542 (1972). Relying on *Moody* v. *Flowers*, 387 U. S. 97 (1967), appellees contend, and the original single-judge District Court held, that Alabama's police jurisdiction statutes lack statewide impact.

A three-judge court was improperly convened in *Moody* because the challenged state statutes had "limited application, concerning only a particular county involved in the litigation . . . ." *Id.*, at 104. In contrast, appellants' constitutional attack focuses upon a state statute that creates the statewide system under which Alabama cities exercise extraterritorial powers. In mandatory terms, the statute provides that municipal police and sanitary ordinances *"shall* have force and effect in the limits of the city or town *and in the police jurisdiction thereof* and on any property or rights-of-way belonging to the city or town." [6] Clearly, Alabama's police

---

[6] Ala. Code § 11–40–10 (1975) (emphasis added). The Alabama Supreme Court has recognized the mandatory nature of § 11–40–10. In *City of Leeds* v. *Town of Moody*, 294 Ala. 496, 319 So. 2d 242 (1975), the court rejected the contention that the city of Leeds had, by discontinuing police and fire protection in its police jurisdiction, "waived and relinquished its police jurisdiction over the area." *Id.*, at 502, 319 So. 2d, at 246. "Since a municipality cannot barter away a governmental power specifically delegated to it by the legislature, . . . it follows that it also cannot waive or relinquish such power." *Ibid.* See also *Trailway Oil Co.* v. *Mobile*, 271 Ala. 218, 224, 122 So. 2d 757, 762 (1960) ("[Section] 9 of Title 37 [now § 11–40–10], describing the territorial extent of the municipal police jurisdiction and the incidents thereof, and § 733 of Title 37 [now § 11–51–91],

jurisdiction statutes have statewide application. See, *e. g.,* *Sailors* v. *Board of Education,* 387 U. S. 105, 107 (1967). That the named defendants are local officials is irrelevant where, as here, those officials are "functioning pursuant to a statewide policy and performing a state function." *Moody* v. *Flowers, supra,* at 102; *Spielman Motor Sales Co.* v. *Dodge, supra,* at 94–95. The convening of a three-judge District Court was proper.

## II

Appellants' amended complaint requested the District Court to declare the Alabama statutes unconstitutional and to enjoin their enforcement insofar as they authorize the extra-territorial exercise of municipal powers. Seizing on the District Court's observation that "[appellants] do not seek extension of the franchise to themselves," appellants suggest that their complaint was dismissed because they sought the wrong remedy.

The unconstitutional predicament in which appellants assertedly found themselves could be remedied in only two ways: (1) the city's extraterritorial power could be negated by invalidating the State's authorizing statutes or (2) the right to vote in municipal elections could be extended to residents of the police jurisdiction. We agree with appellants that a federal court should not dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than another plainly appropriate one. Under the Federal Rules of Civil Procedure "every final judgment shall grant the relief

---

as amended, authorizing and regulating the fixing and collecting of licenses within the police jurisdiction of cities and towns, are general laws, and, as such, they are considered part of every municipal charter"); *Coursey* v. *City of Andalusia,* 24 Ala. App. 247, 247–248, 134 So. 671 (1931) ("Under the statute [§ 11–40–10] the police jurisdiction extends to all the adjoining territory within a mile and a half of the corporate limits of said city, and . . . ordinances of the city enforcing police or sanitary regulations . . . have force and effect not only in the limits of the city, but also in the police jurisdiction thereof").

to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Rule 54 (c). Thus, although the prayer for relief may be looked to for illumination when there is doubt as to the substantive theory under which a plaintiff is proceeding, its omissions are not in and of themselves a barrier to redress of a meritorious claim. See, e. g., 6 J. Moore, W. Taggart, & J. Wicker, Moore's Federal Practice ¶ 54.62, pp. 1261–1265 (2d ed. 1976). But while a meritorious claim will not be rejected for want of a prayer for appropriate relief, a claim lacking substantive merit obviously should be rejected. We think it is clear from the pleadings in this case that appellants have alleged no claim cognizable under the United States Constitution.

## A

Appellants focus their equal protection attack on § 11–40–10, the statute fixing the limits of municipal police jurisdiction and giving extraterritorial effect to municipal police and sanitary ordinances. Citing *Kramer* v. *Union Free School Dist.*, 395 U. S. 621 (1969), and cases following in its wake, appellants argue that the section creates a classification infringing on their right to participate in municipal elections. The State's denial of the franchise to police jurisdiction residents, appellants urge, can stand only if justified by a compelling state interest.

At issue in *Kramer* was a New York voter qualification statute that limited the vote in school district elections to otherwise qualified district residents who (1) either owned or leased taxable real property located within the district, (2) were married to persons owning or leasing qualifying property, or (3) were parents or guardians of children enrolled in a local district school for a specified time during the preceding year. Without deciding whether or not a State may in some circumstances limit the franchise to residents primarily interested in or primarily affected by the activities of a

given governmental unit, the Court held that the statute was not sufficiently tailored to meet that state interest since its classifications excluded many bona fide residents of the school district who had distinct and direct interests in school board decisions and included many residents whose interests in school affairs were, at best, remote and indirect.

On the same day, in *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), the Court upheld an equal protection challenge to a Louisiana law providing that only "property taxpayers" could vote in elections called to approve the issuance of revenue bonds by a municipal utility system. Operation of the utility system affected virtually every resident of the city, not just property owners, and the bonds were in no way financed by property tax revenue. Thus, since the benefits and burdens of the bond issue fell indiscriminately on property owner and nonproperty owner alike, the challenged classification impermissibly excluded otherwise qualified residents who were substantially affected by and directly interested in the matter put to a referendum. The rationale of *Cipriano* was subsequently called upon to invalidate an Arizona law restricting the franchise to property taxpayers in elections to approve the issuance of general obligation municipal bonds. *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970).

Appellants also place heavy reliance on *Evans* v. *Cornman,* 398 U. S. 419 (1970). In *Evans* the Permanent Board of Registry of Montgomery County, Md., ruled that persons living on the grounds of the National Institutes of Health (NIH), a federal enclave located within the geographical boundaries of the State, did not meet the residency requirement of the Maryland Constitution. Accordingly, NIH residents were denied the right to vote in Maryland elections. This Court rejected the notion that persons living on NIH grounds were not residents of Maryland:

"Appellees clearly live within the geographical boundaries of the State of Maryland, and they are treated as state

residents in the census and in determining congressional apportionment. They are not residents of Maryland only if the NIH grounds ceased to be a part of Maryland when the enclave was created. However, that 'fiction of a state within a state' was specifically rejected by this Court in *Howard* v. *Commissioners of Louisville*, 344 U. S. 624, 627 (1953), and it cannot be resurrected here to deny appellees the right to vote." *Id.*, at 421–422.

Thus, because inhabitants of the NIH enclave were residents of Maryland and were "just as interested in and connected with electoral decisions as they were prior to 1953 when the area came under federal jurisdiction and as their neighbors who live off the enclave," *id.*, at 426, the State could not deny them the equal right to vote in Maryland elections.

From these and our other voting qualifications cases a common characteristic emerges: The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned. See, *e. g.*, *Hill* v. *Stone*, 421 U. S. 289 (1975) (invalidating provision of the Texas Constitution restricting franchise on general obligation bond issue to *residents* who had "rendered" or listed real, mixed, or personal property for taxation in the election district); *Harper* v. *Virginia Board of Elections*, 383 U. S. 663 (1966) (invalidating Virginia statute conditioning the right to vote of otherwise qualified *residents* on payment of a poll tax); cf. *Turner* v. *Fouche*, 396 U. S. 346 (1970) (invalidating Georgia statute restricting county school board membership to *residents* owning real property in the county). No decision of this Court has extended the "one man, one vote" principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions. On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its

borders. See, *e. g.*, *Dunn* v. *Blumstein*, 405 U. S. 330, 343–344 (1972); *Evans* v. *Cornman, supra,* at 422; *Kramer* v. *Union Free School Dist.,* 395 U. S., at 625; *Carrington* v. *Rash,* 380 U. S. 89, 91 (1965); *Pope* v. *Williams,* 193 U. S. 621 (1904). Bona fide residence alone, however, does not automatically confer the right to vote on all matters, for at least in the context of special interest elections the State may constitutionally disfranchise residents who lack the required special interest in the subject matter of the election. See *Salyer Land Co.* v. *Tulare Lake Basin Water Storage Dist.,* 410 U. S. 719 (1973); *Associated Enterprises, Inc.* v. *Toltec Watershed Improvement Dist.,* 410 U. S. 743 (1973).

Appellants' argument that extraterritorial extension of municipal powers requires concomitant extraterritorial extension of the franchise proves too much. The imaginary line defining a city's corporate limits cannot corral the influence of municipal actions. A city's decisions inescapably affect individuals living immediately outside its borders. The granting of building permits for high rise apartments, industrial plants, and the like on the city's fringe unavoidably contributes to problems of traffic congestion, school districting, and law enforcement immediately outside the city. A rate change in the city's sales or ad valorem tax could well have a significant impact on retailers and property values in areas bordering the city. The condemnation of real property on the city's edge for construction of a municipal garbage dump or waste treatment plant would have obvious implications for neighboring nonresidents. Indeed, the indirect extraterritorial effects of many purely internal municipal actions could conceivably have a heavier impact on surrounding environs than the direct regulation contemplated by Alabama's police jurisdiction statutes. Yet no one would suggest that nonresidents likely to be affected by this sort of municipal action have a constitutional right to participate in the political processes bringing it about. And unless one adopts the idea that the

Austinian notion of sovereignty, which is presumably embodied to some extent in the authority of a city over a police jurisdiction, distinguishes the direct effects of limited municipal powers over police jurisdiction residents from the indirect though equally dramatic extraterritorial effects of purely internal municipal actions, it makes little sense to say that one requires extension of the franchise while the other does not.

Given this country's tradition of popular sovereignty, appellants' claimed right to vote in Tuscaloosa elections is not without some logical appeal. We are mindful, however, of Mr. Justice Holmes' observation in *Hudson Water Co.* v. *McCarter*, 209 U. S. 349, 355 (1908):

"All rights tend to declare themselve absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. . . . The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side."

The line heretofore marked by this Court's voting qualifications decisions coincides with the geographical boundary of the governmental unit at issue, and we hold that appellants' case, like their homes, falls on the farther side.

## B

Thus stripped of its voting rights attire, the equal protection issue presented by appellants becomes whether the Alabama statutes giving extraterritorial force to certain municipal ordinances and powers bear some rational relationship to a legitimate state purpose. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1 (1973). "The Fourteenth Amendment does not prohibit legislation merely be-

cause it is special, or limited in its application to a particular geographical or political subdivision of the state." *Fort Smith Light Co.* v. *Paving Dist.*, 274 U. S. 387, 391 (1927). Rather, the Equal Protection Clause is offended only if the statute's classification "rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan* v. *Maryland*, 366 U. S. 420, 425 (1961); *Kotch* v. *Board of River Port Pilot Comm'rs*, 330 U. S. 552, 556 (1947).

Government, observed Mr. Justice Johnson, "is the science of experiment," *Anderson* v. *Dunn*, 6 Wheat. 204, 226 (1821), and a State is afforded wide leeway when experimenting with the appropriate allocation of state legislative power. This Court has often recognized that political subdivisions such as cities and counties are created by the State "as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Hunter* v. *Pittsburgh*, 207 U. S. 161, 178 (1907). See also, *e. g., Sailors* v. *Board of Education*, 387 U. S., at 108; *Reynolds* v. *Sims*, 377 U. S. 533, 575 (1964). In *Hunter* v. *Pittsburgh*, the Court discussed at length the relationship between a State and its political subdivisions, remarking: "The number, nature and duration of the powers conferred upon [municipal] corporations and the territory over which they shall be exercised rests in the absolute discretion of the State." 207 U. S., at 178. While the broad statements as to state control over municipal corporations contained in *Hunter* have undoubtedly been qualified by the holdings of later cases such as *Kramer* v. *Union Free School Dist., supra,* we think that the case continues to have substantial constitutional significance in emphasizing the extraordinarily wide latitude that States have in creating various types of political subdivisions and conferring authority upon them.[7]

---

[7] In this case residents of the police jurisdiction are excluded only from participation in municipal elections since they reside outside of Tuscaloosa's corporate limits. This "denial of the franchise," as appellants put it, does not have anything like the far-reaching consequences of the denial

The extraterritorial exercise of municipal powers is a governmental technique neither recent in origin nor unique to the State of Alabama. See R. Maddox, Extraterritorial Powers of Municipalities in the United States (1955). In this country 35 States authorize their municipal subdivisions to exercise governmental powers beyond their corporate limits. Comment, The Constitutionality of the Exercise of Extraterritorial Powers by Municipalities, 45 U. Chi. L. Rev. 151 (1977). Although the extraterritorial municipal powers granted by these States vary widely, several States grant their cities more extensive or intrusive powers over bordering areas than those granted under the Alabama statutes.[8]

---

of the franchise in *Evans* v. *Cornman*, 398 U. S. 419 (1970). There the Court pointed out that "[i]n nearly every election, federal, state, and local, for offices from the Presidency to the school board, and on the entire variety of other ballot propositions, appellees have a stake equal to that of other Maryland residents." *Id.*, at 426. Treatment of the plaintiffs in *Evans* as nonresidents of Maryland had repercussions not merely with respect to their right to vote in city elections, but with respect to their right to vote in national, state, school board, and referendum elections.

[8] Municipalities in some States have almost unrestricted governmental powers over surrounding unincorporated territories. For example, South Dakota cities

"have power to exercise jurisdiction for all authorized purposes over all territory within the corporate limits . . . and in and over all places, except within the corporate limits of another municipality, within one mile of the corporate limits or of any public ground or park belonging to the municipality outside the corporate limits, for the purpose of promoting the health, safety, morals, and general welfare of the community, and of enforcing its ordinances and resolutions relating thereto." S. D. Comp. Laws Ann. § 9–29–1 (1967).

North Dakota's statutory grant of extraterritorial municipal powers is similarly broad:

"Except as otherwise provided by law, a governing body of a municipality shall have jurisdiction:

.        .        .        .        .

"2. In and over all places within one-half mile of the municipal limits for the purpose of enforcing health and quarantine ordinances and regulations and police regulations and ordinances adopted to promote the peace,

In support of their equal protection claim, appellants suggest a number of "constitutionally preferable" governmental alternatives to Alabama's system of municipal police jurisdictions. For example, exclusive management of the police jurisdiction by county officials, appellants maintain, would be more "practical." From a political science standpoint, appellants' suggestions may be sound, but this Court does not sit to determine whether Alabama has chosen the soundest or

order, safety, and general welfare of the municipality." N. D. Cent. Code § 40–06–01 (2) (1968).

Cities in many States are statutorily authorized to zone extraterritorially, see, e. g., Ariz. Rev. Stat. Ann. § 9–240–B–21 (c) (1977); Mich. Comp. Laws § 125.36 (1970); N. D. Cent. Code § 11–35–02 (1976), a power not afforded Alabama municipalities. See Roberson v. City of Montgomery, 285 Ala. 421, 233 So. 2d 69 (1970).

By setting forth these various state provisions respecting extraterritorial powers of cities, we do not mean to imply that every one of them would pass constitutional muster. We do not have before us, of course, a situation in which a city has annexed outlying territory in all but name, and is exercising precisely the same governmental powers over residents of surrounding unincorporated territory as it does over those residing within its corporate limits. See Little Thunder v. South Dakota, 518 F. 2d 1253 (CA8 1975). Nor do we have here a case like Evans v. Cornman, supra, where NIH residents were subject to such "important aspects of state powers" as Maryland's authority "to levy and collect [its] income, gasoline, sales, and use taxes" and were "just as interested in and connected with electoral decisions as . . . their neighbors who live[d] off the enclave." 398 U. S., at 423, 424, 426.

Appellants have made neither an allegation nor a showing that the authority exercised by the city of Tuscaloosa within the police jurisdiction is no less than that exercised by the city within its corporate limits. The minute catalog of ordinances of the city of Tuscaloosa which have extraterritorial effect set forth by our dissenting Brethren, post, at 82–84, n. 10, is as notable for what it does not include as for what it does. While the burden was on appellants to establish a difference in treatment violative of the Equal Protection Clause, we are bound to observe that among the powers not included in the "addendum" to appellants' brief referred to by the dissent are the vital and traditional authorities of cities and towns to levy ad valorem taxes, invoke the power of eminent domain, and zone property for various types of uses.

most practical form of internal government possible. Authority to make those judgments resides in the state legislature, and Alabama citizens are free to urge their proposals to that body. See, *e. g.*, *Hunter* v. *Pittsburgh,* 207 U. S., at 179. Our inquiry is limited to the question whether "any state of facts reasonably may be conceived to justify" Alabama's system of police jurisdictions, *Salyer Land Co.* v. *Tulare Lake Basin Water Storage Dist.,* 410 U. S., at 732, and in this case it takes but momentary reflection to arrive at an affirmative answer.

The Alabama Legislature could have decided that municipal corporations should have some measure of control over activities carried on just beyond their "city limit" signs, particularly since today's police jurisdiction may be tomorrow's annexation to the city proper. Nor need the city's interests have been the only concern of the legislature when it enacted the police jurisdiction statutes. Urbanization of any area brings with it a number of individuals who long both for the quiet of suburban or country living and for the career opportunities offered by the city's working environment. Unincorporated communities like Holt dot the rim of most major population centers in Alabama and elsewhere, and state legislatures have a legitimate interest in seeing that this substantial segment of the population does not go without basic municipal services such as police, fire, and health protection. Established cities are experienced in the delivery of such services, and the incremental cost of extending the city's responsibility in these areas to surrounding environs may be substantially less than the expense of establishing wholly new service organizations in each community.

Nor was it unreasonable for the Alabama Legislature to require police jurisdiction residents to contribute through license fees to the expense of services provided them by the city. The statutory limitation on license fees to half the amount exacted within the city assures that police jurisdiction residents will not be victimized by the city government.

"Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions." *Sailors* v. *Board of Education*, 387 U. S., at 110–111. This observation in *Sailors* was doubtless as true at the turn of this century, when urban areas throughout the country were temporally closer to the effects of the industrial revolution. Alabama's police jurisdiction statute, enacted in 1907, was a rational legislative response to the problems faced by the State's burgeoning cities. Alabama is apparently content with the results of its experiment, and nothing in the Equal Protection Clause of the Fourteenth Amendment requires that it try something new.

## C

Appellants also argue that "governance without the franchise is a fundamental violation of the due process clause." Brief for Appellants 28. Support for this proposition is alleged to come from *United States* v. *Texas*, 252 F. Supp. 234 (WD Tex.) (three-judge District Court), summarily aff'd, 384 U. S. 155 (1966), which held that conditioning the franchise of *otherwise qualified voters* on payment of a poll tax denied due process to many Texas voters. Appellants' argument proceeds from the assumption, earlier shown to be erroneous, *supra*, at 66–70, that they have a right to vote in Tuscaloosa elections. Their conclusion falls with their premise.

## III

In sum, we conclude that Alabama's police jurisdiction statutes violate neither the Equal Protection Clause nor the Due Process Clause of the Fourteenth Amendment. Accordingly, the judgment of the District Court is

*Affirmed.*

MR. JUSTICE STEVENS, concurring.

The Court today holds that the Alabama statutes providing for the extraterritorial exercise of certain limited powers by

municipalities are not unconstitutional. While I join the opinion of the Court, I write separately to emphasize that this holding does not make all exercises of extraterritorial authority by a municipality immune from attack under the Equal Protection Clause of the Fourteenth Amendment.

The Alabama Legislature, which is elected by all of the citizens of the State including the individual appellants, has prescribed a statewide program pursuant to which residents of police jurisdictions are subject to limited regulation by, and receive certain services from, adjacent cities. In return, those residents who are engaged in business are charged license fees equal to one-half those charged to city businesses. In my view, there is nothing necessarily unconstitutional about such a system. Certainly there is nothing in the Federal Constitution to prevent a suburb from contracting with a nearby city to provide municipal services for its residents, even though those residents have no voice in the election of the city's officials or in the formulation of the city's rules. That is essentially what Alabama has accomplished here, through the elected representatives of all its citizens in the state legislature.[1]

Of course, in structuring a system, neither a contracting suburb nor an enacting legislature can consent to a waiver of the constitutional rights of its constituents in the election process. For "when the State delegates lawmaking power to local government and provides for the election of local officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process." *Avery* v. *Midland County,* 390 U. S. 474, 480.

---

[1] I recognize that there is a difference between a suburb's decision to contract with a nearby city and a decision by the state legislature requiring all suburbs to do so. In some situations that difference might justify a holding that a particular extraterritorial delegation of power is unconstitutional. It does not, however, justify the view that all such delegations are invalid.

But the fact that these appellants are subject to certain regulations of the municipality does not itself establish that they are "qualified to vote." Unlike the residents of the National Institutes of Health enclave at issue in *Evans* v. *Cornman,* 398 U. S. 419, appellants are not without any voice in the election of the officials who govern their affairs. They do vote for the county, state, and federal officials who exercise primary control over their day-to-day lives. And even as to their interaction with the government of the city, appellants are not completely without a voice: through their state representatives, they participate directly in the process which has created their governmental relationship with the city. The question then is whether by virtue of that relationship created by state law, the residents of Holt and all other police jurisdictions in the State are entitled to a voice "equally effective" with the residents of the municipalities themselves in the election of the officials responsible for governing the municipalities.

In my judgment, they are not. A State or city is free under the Constitution to require that "all applicants for the vote actually fulfill the requirements of bona fide residence." *Carrington* v. *Rash,* 380 U. S. 89, 96. While it is not free to draw residency lines which deny the franchise to individuals who "are just as interested in and connected with electoral decisions . . . as are their neighbors" who are entitled to vote, *Evans* v. *Cornman, supra,* at 426, the Alabama statutes, at least on their face, do not do so. The powers of extraterritorial jurisdiction granted by the challenged statutes are limited. Tuscaloosa, for example, does not tax the residents of Holt, nor does it control the zoning of their property or the operation of their schools. Indeed, many of the powers traditionally exercised by municipalities—the provision of parks, hospitals, schools, and libraries and the construction and repair of bridges and highways—are entrusted here to the county government, which is fully representative of Holt. Nor is

there any claim that residency lines have generally been drawn invidiously or that residents of the police jurisdictions have been charged unreasonable costs for the services they receive. In sum, appellants have shown no more than that they and all residents of police jurisdictions in Alabama are subject to some—but by no means all—of the regulations and services afforded by the cities to their residents, in return for which they pay license fees half as great as those paid by city residents. Such a showing is plainly insufficient to justify a holding that the Alabama statutes are unconstitutional and cannot be applied anywhere in the State.

This is all that the Court decides today. For this suit was brought under the then-applicable three-judge-court jurisdiction as a challenge to the constitutionality of the Alabama statutes.[2] Appellants did not merely challenge the statutes as applied in the Tuscaloosa police jurisdiction. Rather, they sought to represent all Alabama residents living in contiguous zones, and to have the statutes at issue here declared unconstitutional in all their applications throughout the State. It was for this very reason that the Court of Appeals for the Fifth Circuit concluded that three-judge-court jurisdiction was proper in this case. See *Holt Civic Club* v. *Tuscaloosa,* 525 F. 2d 653, 655 (1975). And it is for this reason that our holding is necessarily a limited one. The statutory scheme created by the Alabama Legislature is not unconstitutional by its terms, but it may well be, as the opinion of the Court recognizes, *ante,* at 72–73, n. 8, that that scheme or another much like it might sometimes operate to deny the franchise to individuals who share the interests of their voting neighbors. No such question, however, is presented by this appeal from the decision of the three-judge District Court. See *Moody* v.

---

[2] 28 U. S. C. § 2281 (1970 ed.), repealed by Pub. L. 94–381, § 1, Aug. 12, 1976, 90 Stat. 1119.

*Flowers,* 387 U. S. 97; *Rorick v. Board of Comm'rs,* 307 U. S. 208.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

Alabama creates by statute an area of "police jurisdiction" encompassing all adjoining territory within three miles of the corporate limits of cities with a population of 6,000 or more. Within this police jurisdiction Alabama law provides that "[o]rdinances of a city . . . enforcing police or sanitary regulations and prescribing fines and penalties for violations thereof shall have force and effect . . . ." Ala. Code § 11–40–10 (1975).[1] Alabama law provides in addition that a city "may fix and collect licenses for any business, trade or profession done within the police jurisdiction of such city . . . provided, that the amount of such licenses shall not be more than one half the amount charged and collected as a license for like business, trade or profession done within the corporate limits of such city . . . ." Ala. Code § 11–51–91 (1975).[2] At the time this lawsuit commenced on August 7, 1973, Alabama vested jurisdiction of the prosecution of breaches of municipal ordinances occurring within a police jurisdiction in a recorder's court,[3] the recorder being elected by a city's board of commissioners. Ala. Code, Tit. 37, § 584 (1958).[4]

---

[1] At the time this lawsuit commenced, this statute was codified at Ala. Code, Tit. 37, § 9 (1958).

[2] At the time appellants filed their complaint, this statute was found at Ala. Code, Tit. 37, § 733 (1958). Minor changes in wording were effected during recodification.

[3] Alabama Code, Tit. 37, § 585 (1958) provided:

"It shall be the duty of the recorder to keep an office in the city, and hear and determine all cases for the breach of the ordinances and by-laws of the city that may be brought before him, and he shall make report, at least once a month, of all fines, penalties and forfeitures imposed by him, or by any councilman in his stead. Such recorder is especially vested

Appellants are the Holt Civic Club and seven residents of the unincorporated community of Holt, which lies within the police jurisdiction of the city of Tuscaloosa, Ala.[5] Although appellants are thus subject to Tuscaloosa's police and sanitary ordinances, to the jurisdiction of its municipal court,[6] and to the requirements of its licensing fees, appellants are not permitted to vote in Tuscaloosa's municipal elections, or to participate in or to initiate Tuscaloosa's referenda or recall elections. Appellants claim that this disparity "infringes on their constitutional right (under the due process and equal protection clauses) to a voice in their government." Complaint ¶ 11. The three-judge District Court below dismissed appellants' equal protection and due process claims.[7] Without reaching the due process issue, I would reverse the judgment of the District Court and hold that appellants' equal protection claim should have been sustained.

It is, of course, established that once a "franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 665 (1966). Because "statutes distributing the franchise

---

with and may exercise in the city and within the police jurisdiction thereof, full jurisdiction in criminal and quasi criminal matters, and may impose the penalties prescribed by ordinance for the violation of ordinances and by-laws of the city, and shall have the power of an ex-officio justice of the peace, except in civil matters. . . ."

[4] On December 27, 1973, recorder's courts were abolished in Alabama and replaced by municipal courts having virtually identical jurisdiction. See Ala. Code § 12–14–1 (1975). Municipal judges "shall be appointed and vacancies filled by the governing body of the municipality . . . ." Ala. Const., Amdt. No. 328, § 6.065.

[5] Tuscaloosa contains 65,773 residents, while the police jurisdiction surrounding the city contains between 16,000 and 17,000 residents. See App. 17–19.

[6] See n. 4, *supra.*

[7] The court granted appellants leave "to further amend within 45 days to specify particular ordinances of the City of Tuscaloosa which are claimed to deprive plaintiffs of liberty or property."

constitute the foundation of our representative society," *Kramer* v. *Union Free School Dist.*, 395 U. S. 621, 626 (1969), we have subjected such statutes to "exacting judicial scrutiny." *Id.*, at 628.[8] Indeed, "if a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.' [*Kramer* v. *Union Free School Dist.*, 395 U. S.,] at 627 (emphasis added)." *Dunn* v. *Blumstein,* 405 U. S. 330, 337 (1972). The general rule is that "whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election . . . ." *Hadley* v. *Junior College Dist.*, 397 U. S. 50, 56 (1970).

Our decisions before today have held that bona fide residency requirements are an acceptable means of distinguishing qualified from unqualified voters. *Dunn* v. *Blumstein, supra,* at 343. The Court holds today, however, that the restriction of the franchise to those residing within the corporate limits of the city of Tuscaloosa is such a bona fide residency requirement. The Court rests this holding on the conclusion that "a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Ante,* at 68–69. The Court thus insulates the Alabama statutes challenged in this case from the strict judicial scrutiny ordinarily applied to state laws distributing the franchise. In so doing, the Court cedes to geography a talismanic significance contrary to the theory and meaning of our past voting-rights cases.

We have previously held that when statutes distributing the franchise depend upon residency requirements, state-law

---

[8] "[S]tatutes structuring local government units receive no less exacting an examination merely because the state legislature is fairly elected. See *Avery* v. *Midland County,* 390 U. S. 474, 481 n. 6 (1968)." *Kramer* v. *Union Free School Dist.*, 395 U. S., at 628 n. 10.

characterizations of residency are not controlling for purposes of the Fourteenth Amendment. See, e. g., *Evans* v. *Cornman,* 398 U. S. 419 (1970); *Carrington* v. *Rash,* 380 U. S. 89 (1965). Indeed, *Dunn* v. *Blumstein, supra,* was careful to exempt from strict judicial scrutiny only bona fide residency requirements that were "appropriately defined and uniformly applied." 405 U. S., at 343. The touchstone for determining whether a residency requirement is "appropriately defined" derives from the purpose of such requirements, which, as stated in *Dunn,* is "to preserve the basic conception of a political community." *Id.,* at 344. At the heart of our basic conception of a "political community," however, is the notion of a reciprocal relationship between the process of government and those who subject themselves to that process by choosing to live within the area of its authoritative application.[9] Cf. *Avery* v. *Midland County,* 390 U. S. 474, 485 (1968). Statutes such as those challenged in this case, which fracture this relationship by severing the connection between the process of government and those who are governed in the places of their residency, thus undermine the very purposes which have led this Court in the past to approve the application of bona fide residency requirements.

There is no question but that the residents of Tuscaloosa's police jurisdiction are governed by the city.[10] Under Ala-

---

[9] The Court apparently accepts this proposition by strongly implying, *ante,* at 73 n. 8, that "a situation in which a city has annexed outlying territory in all but name, and is exercising precisely the same governmental powers over residents of surrounding unincorporated territory as it does over those residing within its corporate limits" would not "pass constitutional muster."

[10] Appellants have included in their brief an unchallenged addendum listing the ordinances of the city of Tuscaloosa, Code of Tuscaloosa (1962, Supplemented 1975), that have application in its police jurisdiction:

*"Licenses:*

4–1 ambulance

9–4, 9–18, 9–33 bottle dealers

bama law, a municipality exercises "governing" and "law-making" power over its police jurisdiction. *City of Homewood* v. *Wofford Oil Co.*, 232 Ala. 634, 637, 169 So. 288, 290 (1936). Residents of Tuscaloosa's police jurisdiction are sub-

19–1 junk dealers
20–5 general business license ordinance
20–67 florists
20–102 hotels, motels, etc.
20–163 industry
*"Buildings:*
10–1 inspection service enforces codes
10–10 regulation of dams
10–21 Southern Standard Building Code adopted
10–25 building permits
13–3 National Electrical Code adopted
14–23 Fire Prevention Code adopted
14–65 regulation of incinerators
14–81 discharge of cinders
Chapter 21A mobile home parks
25–1 Southern Standard Plumbing Code adopted
33–79 disposal of human wastes
33–114, 118 regulation of wells
*"Public Health:*
5–4 certain birds protected
5–4C, 42, 55 dogs running at large and bitches in heat prohibited
14–4 no smoking on buses
14–15 no self-service gas stations
15–2 regulation of sale of produce from trucks
15–4 food establishments to use public water supply
15–16 food, meat, milk inspectors
15–37 thru 40 regulates boardinghouses
15–52 milk code adopted
17–5 mosquito control
*"Traffic Regulations:*
22–2 stop & yield signs may be erected by chief of police
22–3 mufflers required
22–4 brakes required
22–5 inspection of vehicle by police
22–6 operation of vehicle

ject to license fees exacted by the city, as well as to the city's police and sanitary regulations, which can be enforced through penal sanctions effective in the city's municipal court. See *Birmingham* v. *Lake*, 243 Ala. 367, 372, 10 So. 2d 24, 28 (1942). The Court seems to imply, however, that residents of the police jurisdiction are not governed enough to be included within the political community of Tuscaloosa, since they are not subject to Tuscaloosa's powers of eminent domain, zoning,

22–9 hitchhiking in roadway prohibited
22–9.1 permit to solicit funds on roadway
22–11 impounding cars
22–14 load limit on bridges
22–15 police damage stickers required after accident
22–25 driving while intoxicated
22–26 reckless driving
22–27 driving without consent of owner
22–33 stop sign
22–34 yield sign
22–38 driving across median
22–40 yield to emergency vehicle
22–42 cutting across private property
22–54 general speed limit
22–72 thru 78 truck routes
*"Criminal Ordinances:*
23–1 adopts all state misdemeanors
23–7.1 no wrecked cars on premises
23–15 nuisances
23–17 obscene literature
23–20 destruction of plants
23–37 swimming in nude
23–38 trespass to boats
26–51 no shooting galleries in the police jurisdiction or outside fire limits
         (downtown area)
28–31 thru 39 obscene films
*"Miscellaneous:*
20–120 thru 122 cigarette tax
24–31 public parks and recreation
26–18 admission tax
Chapter 29 regulates public streets
30–23 taxis must have meters."

or ad valorem taxation. *Ante,* at 73 n. 8. But this position is sharply contrary to our previous holdings. In *Kramer* v. *Union Free School Dist.,* 395 U. S. 621 (1969), for example, we held that residents of a school district who neither owned nor leased taxable real property located within the district, or were not married to someone who did, or were not parents or guardians of children enrolled in a local district school, nevertheless were sufficiently affected by the decisions of the local school board to make the denial of their franchise in local school board elections a violation of the Equal Protection Clause. Similarly, we held in *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), that a Louisiana statute limiting the franchise in municipal utility system revenue bond referenda to those who were "property taxpayers" was unconstitutional because all residents of the municipality were affected by the operation of the utility system. See *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970).

The residents of Tuscaloosa's police jurisdiction are vastly more affected by Tuscaloosa's decisionmaking processes than were the plaintiffs in either *Kramer* or *Cipriano* affected by the decisionmaking processes from which they had been unconstitutionally excluded. Indeed, under Alabama law Tuscaloosa's authority to create and enforce police and sanitary regulations represents an extensive reservoir of power "to prevent, an anticipation of danger to come, . . . and in so doing to curb and restrain the individual tendency." *Gilchrist Drug Co.* v. *Birmingham,* 234 Ala. 204, 208, 174 So. 609, 612 (1937). See *Cooper* v. *Town of Valley Head,* 212 Ala. 125, 126, 101 So. 874, 875 (1924). A municipality, for example, may use its police powers to regulate, or even to ban, common professions and businesses. "In the exertion and application of the police power there is to be observed the sound distinction as to useful and harmless trades, occupations and businesses and as to businesses, occupations and trades recognized as hurtful to public morals, public safety,

productive of disorder or injurious to public good. In applying it to the class last mentioned it may be exerted to destroy." *Chappell* v. *Birmingham,* 236 Ala. 363, 365, 181 So. 906, 907 (1938). The Court today does not explain why being subjected to the authority to exercise such extensive power does not suffice to bring the residents of Tuscaloosa's police jurisdiction within the political community of the city. Nor does the Court in fact provide any standards for determining when those subjected to extraterritorial municipal legislation will have been "governed enough" to trigger the protections of the Equal Protection Clause.

The criterion of geographical residency relied upon by the Court is of no assistance in this analysis. Just as a State may not fracture the integrity of a political community by restricting the franchise to property taxpayers, so it may not use geographical restrictions on the franchise to accomplish the same end. This is the teaching of *Evans* v. *Cornman. Evans* held, contrary to the conclusion of the Maryland Court of Appeals, that those who lived on the grounds of the National Institutes of Health (NIH) enclave within Montgomery County were residents of Maryland for purposes of the franchise. Our decision rested on the grounds that inhabitants of the enclave were "treated as state residents in the census and in determining congressional apportionment," 398 U. S., at 421, and that "residents of the NIH grounds are just as interested in and connected with electoral decisions as they were prior to 1953 when the area came under federal jurisdiction and as are their neighbors who live off the enclave." *Id.,* at 426. Residents of Tuscaloosa's police jurisdiction are assuredly as "interested in and connected with" the electoral decisions of the city as were the inhabitants of the NIH enclave in the electoral decisions of Maryland. True, inhabitants of the enclave lived "within the geographical boundaries of the State of Maryland," but appellants in this case similarly reside within the geographical boundaries of Tus-

caloosa's police jurisdiction. They live within the perimeters of the city's "legislative powers." *City of Leeds* v. *Town of Moody,* 294 Ala. 496, 501, 319 So. 2d 242, 246 (1975).

The criterion of geographical residency is thus entirely arbitrary when applied to this case. It fails to explain why, consistently with the Equal Protection Clause, the "government unit" which may exclude from the franchise those who reside outside of its geographical boundaries should be composed of the city of Tuscaloosa rather than of the city together with its police jurisdiction. It irrationally distinguishes between two classes of citizens, each with equal claim to residency (insofar as that can be determined by domicile or intention or other similar criteria), and each governed by the city of Tuscaloosa in the place of their residency.

The Court argues, however, that if the franchise were extended to residents of the city's police jurisdiction, the franchise must similarly be extended to all those indirectly affected by the city's actions. This is a simple non sequitur. There is a crystal-clear distinction between those who reside in Tuscaloosa's police jurisdiction, and who are therefore subject to that city's police and sanitary ordinances, licensing fees, and the jurisdiction of its municipal court, and those who reside in neither the city nor its police jurisdiction, and who are thus merely affected by the indirect impact of the city's decisions. This distinction is recognized in Alabama law, cf. *Roberson* v. *City of Montgomery,* 285 Ala. 421, 233 So. 2d 69 (1970), and is consistent with, if not mandated by, the very conception of a political community underlying constitutional recognition of bona fide residency requirements.

Appellants' equal protection claim can be simply expressed: The State cannot extend the franchise to some citizens who are governed by municipal government in the places of their residency, and withhold the franchise from others similarly situated, unless this distinction is necessary to promote a compelling state interest. No such interest has been articu-

lated in this case. Neither Tuscaloosa's interest in regulating "activities carried on just beyond [its] 'city limit' signs," *ante*, at 74, nor Alabama's interest in providing municipal services to the unincorporated communities surrounding its cities, *ibid.*, are in any way inconsistent with the extension of the franchise to residents of Tuscaloosa's police jurisdiction. Although a great many States may presently authorize the exercise of extraterritorial lawmaking powers by a municipality,[11] and although the Alabama statutes involved in this case may be of venerable age, neither of these factors, as *Reynolds* v. *Sims*, 377 U. S. 533 (1964), made clear, can serve to justify practices otherwise impermissible under the Equal Protection Clause of the Fourteenth Amendment.

Therefore, since the statutes challenged by appellants distinguish among otherwise qualified voters without a compelling justification, I would reverse the judgment of the District Court and hold the challenged statutes to be in violation of the Equal Protection Clause.

---

[11] See Comment, The Constitutionality of the Exercise of Extraterritorial Powers by Municipalities, 45 U. Chi. L. Rev. 151 (1977).