John E. Schmidt (dismissed), Sandra K. Clausen, Gene A. Clausen, Marcia Thompson and Jeffrey C. Thompson, Plaintiffs-Appellants,†

v.

City of Kenosha, Common Council, and City of Kenosha, a municipal corporation, Defendants-Respondents.

Scott M. Pederson, Cynthia A. Pederson, Jeffrey Thompson and Marcia Thompson, Plaintiffs-Appellants,†

v.

City of Kenosha, Common Council, and City of Kenosha, a municipal corporation, Defendants-Respondents.

Court of Appeals

*No. 96–2380. Submitted on briefs August 29, 1997.—Decided October 29, 1997.*

(Also reported in 571 N.W.2d 892.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Gary W. Thompson* of *G.W. Thompson & Assoc. S.C.* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *James W. Conway,* city attorney.

On behalf of the State of Wisconsin, there was a brief filed by *James E. Doyle,* attorney general, and *Mary Woolsey Schlaefer,* assistant attorney general.

Before Snyder, P.J., Brown and Nettesheim, JJ.

BROWN, J. Section 114.136, STATS., grants municipalities extraterritorial zoning power to ensure the safety of aerial approaches to airports. Pursuant to this statute, the City of Kenosha enacted such an ordinance. Certain landowners affected by the ordinance, but residing outside the corporate limits of the City, claim that § 114.136 unconstitutionally infringed upon

their right to participate in the political process which culminated in the ordinance. We agree with the trial court, however, that the statute is a valid exercise of the state's police power which does not infringe upon the voting rights of the nonresidents and affirm.

The City, a municipal corporation, decided to build an airport within its city limits. Pursuant to § 114.136, STATS., the Common Council passed KENOSHA, WIS., ZONING ORDINANCE 79–94, § 13 (1994), thereby creating an airport zoning overlay ordinance. This zoning ordinance placed various permanent height and use restrictions on land up to three miles from the airport, including land outside of the City's boundaries normally not subject to the City's zoning powers, so that land use in these areas would be compatible with ensuring the safety of the aerial approaches to the airport.

Sandra K. Clausen, Gene A. Clausen, Marcia Thompson, Jeffrey C. Thompson, Scott M. Pederson and Cynthia A. Pederson all reside and own land outside of the city that is directly affected by the City's airport zoning ordinance. The effect of the zoning ordinance on the landowners is to prohibit the construction of residential housing or overnight accommodations along aerial approaches near the airport, although the land can still be used for agricultural or commercial purposes. The landowners brought suit against the City and the Common Council seeking a statutory and common law writ of certiorari to declare ZONING ORDINANCE 79–94 unconstitutional under the Equal Protection Clauses of the United States and Wisconsin constitutions and to find that the airport zoning ordinance placed unreasonable restrictions on the use of

their land.[1] The trial court granted summary judgment in favor of the City.

On appeal, the landowners again challenge the state's grant of extraterritorial zoning power to municipalities under § 114.136, STATS., and the municipal ordinance authorized by it, as violative of both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Article I, § 1 of the Wisconsin Constitution. The landowners' major contention remains that the extraterritorial grant of power violates the "one man, one vote" principle because the City's zoning ordinance amounted to a governmental action which substantially affected them without simultaneously granting them the right to participate in the City's political process. The landowners contend that under the "one man, one vote" principle, they should have been granted the "power of the ballot

---

[1] Initially, John E. Schmidt, Sandra K. Clausen and Marcia Thompson brought suit against the City of Kenosha. The trial court granted summary judgment to the landowners, finding that the ordinance was void because the public notice requirements of §§ 985.02(1), 62.23(6)(g) and 114.136(2)(a) STATS., were not complied with. John E. Schmidt requested and was dismissed from all subsequent proceedings. The City quickly cured these procedural defects and the trial court rescheduled the action. Gene A. Clausen and Jeffrey C. Thompson were then added as plaintiffs to the lawsuit, and the Common Council was added as a defendant. A second suit was also brought against the same defendants by Jeffrey C. Thompson and Marcia Thompson, along with Scott M. Pederson and Cynthia A. Pederson against the City and the Common Council seeking to declare the statute and ordinance unconstitutional under the Equal Protection Clauses of the United States and Wisconsin constitutions, along with a claim that the zoning ordinance placed unreasonable restrictions on the use of their land. The trial court consolidated the two actions.

box" so that they could participate in the election of those officials responsible for the creation of the zoning legislation. We will discuss the "one man, one vote" contention first.

We initially note that in *State ex rel. Sonneborn v. Sylvester,* 26 Wis. 2d 43, 49, 132 N.W.2d 249, 252 (1965), our supreme court held that Article I, § 1 of the Wisconsin Constitution is substantially equivalent to the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Thus, in our analysis of the landowners' voting rights claim, the two constitutions are treated as one and the same. *See id.* at 50, 132 N.W.2d at 252. Also, it is well established that a heavy presumption of constitutionality attaches to each and every legislative act. *See State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784, 792 (1973). Accordingly, the unconstitutionality of a specific act must be demonstrated beyond a reasonable doubt. *See id.* The constitutionality of a statute is a question of law which we review without deference to the conclusion of the trial court. *See Sears, Roebuck & Co. v. Plath,* 161 Wis. 2d 587, 592, 468 N.W.2d 689, 691 (1991).

In § 114.136, STATS., the state legislature delegated specific regulatory powers to local municipalities. The statute, entitled "airport approach protection," allows municipalities to protect the aerial approaches to airports through the use of restrictive zoning up to three miles from the airport boundary. *See* § 114.136(1)(a) & (2)(b). It states that a municipality may "determin[e] the use, location, height, number of stories and size of buildings and structures . . . in the vicinity of [the airport] and [the municipality] may divide the territory to be protected into several areas

and impose different regulations and restrictions with respect to each area." Section 114.136(1)(a). These zoning powers extend to all lands within the three-mile boundary, even if they are outside the limits of the municipality. *See id.* General restrictions on this power are found in § 114.136(2), and the municipality must exercise its right of eminent domain if greater restrictions are deemed necessary. *See* § 114.136(2)(b) & (c).

The answer to the landowners' equal protection claim is best made by examining and discussing the *ratio decidendi* of two federal cases and then applying their rationale to the instant case. The two cases are: *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60 (1978), and *Little Thunder v. South Dakota,* 518 F.2d 1253 (8th Cir. 1975).

In *Holt,* the Court refused to extend the "one man, one vote" principle to cover a state's grant of extraterritorial power to a municipality. *See Holt,* 439 U.S. at 70. There, a state statute provided that police and sanitary regulations of certain sized cities shall extend a certain distance beyond the City's corporate limits. *See id.* at 61–62. The plaintiffs, residents of an unincorporated community subject to the City's police and sanitary regulations, claimed that the statute violated their equal protection and due process rights because it did not extend to them the right to participate in the City's electoral process. *See id.* at 62–63. As in the case before us, the plaintiffs claimed that the statute was unconstitutional because they were substantially affected by the City's decisions but denied the right to vote in the City's elections. *See id.*

In deciding against the plaintiffs, the Court reasoned that a state's political subdivisions are not simply states-in-miniature which exist solely to represent their local constituencies, but are also " 'con-

533

venient agencies for exercising such of the governmental powers of the state as may be entrusted to them.' " *Id.* at 71 (quoted source omitted). Because states have extraordinarily wide latitude in "creating various type of political subdivisions and conferring authority upon them," states can reasonably determine that extraterritoriality satisfies the state's interest in providing basic municipal services such as police and sanitation on the urban fringe. *Id.* at 71–72. The *Holt* Court noted that the case before it was not one where the state's grant of extraterritorial power was so broad that it allowed the City to annex the surrounding unincorporated areas in all but name by exercising precisely the same governmental powers over nonresidents as it did over residents residing within its corporate limits. *See id.* at 72 n.8. Nor did it subject nonresidents to " 'important aspects of state powers' " such as the ability to levy and collect taxes. *See id.* (quoted source omitted). The powers of extraterritorial jurisdiction were limited, and the plaintiffs were "not without any voice in the election of the officials who govern their affairs." *Id.* at 77 (Stevens, J., concurring). Having severed the voting rights issue from the extraterritoriality question, the Court then went on to uphold the state statute as a valid exercise of the state's police power. *See id.* at 70–75.

In *Little Thunder*, however, the federal court of appeals held in favor of the plaintiffs' "one man, one vote" argument. *See Little Thunder*, 518 F.2d at 1254. There, the plaintiffs, who were residents of an unorganized county, were not permitted under state law to elect their own officials. *See id.* at 1254–55. Instead, a neighboring organized county provided all of the local government and administrative services for the unorganized county. *See id.* at 1254. The residents of the

unorganized county were barred from participating in the election of the officials in the organized county to which they were attached. *See id.* at 1254–55. The court determined that the state grant of extraterritorial power allowed the organized counties to annex the unorganized county in all but name because the "unorganized count[y] and organized county to which it is attached form [ed] a single unit of local government 'for the administration of governmental and fiscal affairs, including all state, county, judicial, taxation, election, recording, canvassing, and foreclosure purposes . . . .' " *Id.* at 1256. Therefore, the residents of the unorganized county possessed a substantial interest in the choice of the county officials who governed their affairs. *See id.* Because there was no compelling state interest justifying the denial of the plaintiffs' right to vote in an election of general interest for their governing officials, the state statute violated the "one man, one vote" principle. *See id.* at 1255.

While these two cases reached different results, the rationale upon which they were founded is the same. In *Little Thunder*, the state statute treated the municipalities as states-in-miniature and gave them broad decision-making powers over neighboring areas on an array of public service and governmental issues without simultaneously granting the nonresidents of affected areas the right to vote. *See id.* at 1254–55. The nonresidents were denied a voice in the operation of their local government because they could not elect the local officials who administered their governmental and fiscal affairs. *See id.* at 1256.

In *Holt*, however, the state did not grant the municipality broad governmental and administrative decision-making powers. *See Holt,* 439 U.S. at 72 n.8. Rather, the municipality was acting as an agent of the

state carrying out a valid state police power locally. Because the municipality was acting in its role as an agent of the state promoting a state interest, it did not matter that the municipality's decision had an extraterritorial impact. *See id.* at 69–70. A state has broad powers in conferring authority on local political subdivisions, and it could reasonably determine that extraterritoriality satisfies the state interest in providing basic municipal services on the urban fringe. *See id.* at 71–72. In sum, the state statute in *Holt* did not treat the municipality as a state-in-miniature, but as an instrument of the state; the municipalities' powers were narrowly limited to one or a few service delivery functions promoting the state's interest.

It is true that in this case the extraterritorial effect of Kenosha's exercise of the zoning power over the landowners resembles a typical local governmental power. However, extraterritorial effect by itself does not implicate the nonresidents' voting rights; "one vote, one man" does not confer upon individuals the right to participate in all of the decisions that affect them. We view the Supreme Court as having decided that it is a matter of degree; there must be a tight nexus between the demand for the franchise and the interest in the local government. *See* Richard Briffault, *Who Rules at Home?: One Person / One Vote and Local Governments*, 60 U. Chi. L. Rev. 339, 388 (1993). Courts must decide whether the grant of power is for the purpose of carrying out a state police power locally, or if the grant of power permits a municipality to administer the governmental or fiscal affairs of its neighbors. To make this decision, courts must look at certain factors, such as whether the statute subjects nonresidents to " 'important aspects of state power' " such as the ability

to levy and collect taxes or make spending decisions. *See Holt* at 72 n.8 (quoted source omitted). If the court concludes that the grant of power to the municipality confers upon it broad decision-making power over the governmental or fiscal affairs of its neighbors, the nexus between the demand for the franchise and the interest in the local government is tight and the "one man, one vote" principle has been violated. The municipality is seen as acting as a state-in-miniature, not as an agent of the state.

We conclude that the state grant of power in § 114.136, STATS., is a limited grant of state power to the municipalities to carry out a valid state police power to promote the public safety along aerial approaches to airports. This case falls on the *Holt* side of the ledger, not the *Little Thunder* side. Section 114.136 does not allow a municipality to exercise many of the same zoning powers over nonresidents as it typically exercises over residents residing within its corporate limits. The grant of extraterritorial zoning power is limited to allowing a municipality to promote the public safety along aerial approaches. While the landowners concededly have no right to participate in the zoning decisions regarding the airport, they maintain their overall political enfranchisement regarding all other public services and issues which include zoning issues unrelated to the airport. Thus, the "one man, one vote" principle has not been violated.

We also note that our analysis is consistent with *Walworth County v. City of Elkhorn,* 27 Wis. 2d 30, 37–38, 133 N.W.2d 257, 261 (1965), in which our supreme court rejected the plaintiffs' voting rights claim and upheld an extraterritorial grant of zoning power to municipalities as a valid exercise of the state's

police power. In that case, the plaintiffs challenged the constitutionality of a state statute allowing cities to exercise temporary extraterritorial zoning powers over unincorporated areas within one and one-half miles of a city's corporate limits. *See id.* at 34, 133 N.W.2d at 259. The court noted that with rapidly expanding urban populations, most cities from time to time extended their limits into adjacent areas through annexation. *See id.* at 37, 133 N.W.2d at 261. Therefore, the state had an interest in controlling land use in areas adjacent to cities in order to preserve the land for residential use. *See id.* at 37–38, 133 N.W.2d at 261. As in the case before us, the municipality was acting as an agent of the state and discharging state police power responsibilities locally.

■

Without its voter rights attire, the equal protection claim presented by the landowners becomes whether § 114.136, STATS., by giving extraterritorial force to the City's municipal ordinance, bears a rational relationship to a legitimate state purpose. *See Holt*, 439 U.S. at 70. A state statute will be found constitutional unless it " 'rests on grounds wholly irrelevant to the achievement of the State's objective.' " *See id.* at 71 (quoted source omitted). However, the landowners do not advance any argument to contest the conclusion that the grant of power is rationally related to achieving the state's purpose of promoting public safety along aerial approaches. Therefore, we affirm the trial court's holding that the state statute, and the underlying municipal ordinance authorized by it, are constitutional.

We also reject the landowners' claim that the underlying municipal ordinance is more restrictive than necessary to promote the public safety, welfare

and convenience. As long as the Common Council acted within the bounds of the legislative field, its discretion is controlling and we cannot, and will not, substitute our opinion for that of the legislative body. *See Eggebeen v. Sonnenburg,* 239 Wis. 213, 219, 1 N.W.2d 84, 86 (1941).

The zoning ordinance is not arbitrary or capricious, but is reasonably related to a legitimate public purpose. *See Town of Richmond v. Murdock,* 70 Wis. 2d 642, 647, 235 N.W.2d 497, 500 (1975). The zoning ordinance itself states that it is intended to minimize obstruction to aviation, risk of loss of life and property, and the risk of loss of use and enjoyment of property due to aircraft noise levels. Moreover, the Common Council did not arbitrarily decide what land would be covered by the restrictive zoning ordinance, and even the landowners concede in their brief that they are a class of people subject to airplane approach and departure overflights. The record shows that the Common Council commissioned two studies to determine incompatible land use and future growth risk areas. Based on these studies, the Common Council decided what permanent zoning restrictions pursuant to § 114.136, STATS., were necessary to ensure that the land was not developed for uses incompatible with airport safety. Although the landowners claim that these restrictions are "unnecessary" and do little to promote public safety, they do not claim that the ordinance does more than authorized by § 114.136. Therefore, we will not substitute our determination of what is reasonably related to the promotion of public safety for that of a legislative body acting within the bounds of the legisla-

tive field.[2] *See Eggebeen,* 239 Wis. at 219, 1 N.W.2d at 86.

*By the Court.*—Judgment affirmed.

---

[2] The landowners also contend that the trial court misused its discretion when it awarded them $100 in costs. According to the landowners' claim, they are entitled to $1513.30 in costs because the trial court declared the original zoning ordinance invalid. This argument must fail because under § 814.02, STATS., costs in equitable actions or special proceedings are awarded at the trial court's discretion and, in any case, may not exceed $100. *See* § 814.02(2). Special actions are defined as those actions which are not instituted and prosecuted according to the ordinary rules and provisions relating to actions at law or suits in equity, but along some special mode. *See State v. Jakubowski,* 61 Wis. 2d 220, 224 n.2, 212 N.W.2d 155, 156–57 (1973). A common law writ of certiorari is not an ordinary court proceeding. The writ is issued by the court in the exercise of its supervisory jurisdiction over lower tribunals, quasi-judicial boards and commissions, *see State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 499, 107 N.W. 500, 509–10 (1906), only after the court determines that there has been an error causing substantial harm and the petitioner has not been guilty of laches in seeking a remedy, *see Consolidated Apparel Co. v. Common Council of Milwaukee,* 14 Wis. 2d 31, 36, 109 N.W.2d 486, 489 (1961). Further, it is in the court's discretion to issue the writ, and it may decline to do so if it concludes that the error was minor and interference by the court would only further complicate matters. *See State ex rel. Hron Bros. Co. v. City of Port Washington,* 265 Wis. 507, 509, 62 N.W.2d 1, 2 (1953). Therefore, a common law writ of certiorari is, by definition, a special action and the maximum amount of costs the trial court could award under § 814.02 was $100.