INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Victor Arteaga and Josefa Arteaga, for themselves and for their minor children, Rolando Arteaga, Daniel Arteaga, John Arteaga and Michael Arteaga, Willie F. Conner and Lucy Conner, for themselves and for their minor children, Ladonna Conner, Deshawn Conner and Elwanda Conner, Albert Girgen and Jane A. Platt, on behalf of themselves and on behalf of other employees and their dependents similarly situated, Plaintiffs

v.

MICHIGAN EMPLOYMENT SECURITY COMMISSION (MESC), S. Martin Taylor, Director of MESC, Walter Campbell, Frank C. Padzieski, Alex Fuller, Raymond M. Lyons, and Roy Levy Williams, Members of MESC, Garfield Geddis, Chief Referee of the MESC, The Referee Section of the MESC, William J. McBrearty, Gladys Johnson and Gerard Peplowski, Members of the Appeal Board of the MESC, and The Appeal Board of the MESC, and the successors in office of all of said agencies and persons, Defendants.

Civ. A. No. 74–72964.

United States District Court,
E. D. Michigan, S. D.

Nov. 20, 1980.

As Amended Jan. 19 and Jan. 20, 1981.

Jordan Rossen, Marilyn M. Mosier, John A. Fillion, Marley S. Weiss, M. Jay Whitman, Edwin G. Fabre, Leonard R. Page (UAW), Detroit, Mich., Jeanne Mirer, Wayne County Neighborhood Legal Services, Detroit, Mich., for plaintiffs.

Frank Kelley, Atty. Gen., Felix League, Asst. Atty. Gen., George Blagy, Asst. Atty. Gen., for State of Michigan, Michael Kelly, Detroit, Mich., for Chrysler.

Portia Y. T. Hamlar, Detroit, Mich., amicus Chrylser.

James A. Brown, Kermit G. Bailer, Dearborn, Mich., for Ford Motor Co.

Charlene Snow, Detroit, Mich., for Mich. Legal Services.

Jeanne Mirer, Detroit, Mich., for Center for Urban Law.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' THIRD MOTION FOR SUMMARY JUDGMENT

JULIAN ABELE COOK, Jr., District Judge.

The Plaintiffs, through this class action, challenge the validity of § 421.62(b) of the Michigan Compiled Laws, and more popularly known as the Michigan Unemployment Compensation Act (hereinafter "Act"), contending that it impermissibly conflicts with 42 U.S.C. § 503(a), Title III, "Grants to States for Unemployment Compensation Administration," Social Security Act and § 3304(a)(4) of Chapter 23, Federal Unemployment Tax Act, 26 U.S.C. § 3304(a)(4).[1]

Under § 62(b), if the Michigan Employment Security Commission (hereinafter "MESC") determines that a claimant has made a false statement or representation, or has concealed material information, the claimant forfeits his credit weeks for the benefit years in which the fraud occurred and must repay monies that had been improperly received. Additionally, if the claimant becomes unemployed and applies for benefits within a fifty-two week period

---

1. Section 62(b) reads as follows:

   If the commission determines that any person has intentionally made a false statement or misrepresentation or has concealed material information to obtain benefits, whether or not he obtains benefits by or because of such intentional false statement, misrepresentation, or concealment of material information he shall, in addition to any other applicable penalties, have all his uncharged credit weeks with respect to the benefit year in which such act occurred canceled as of the date the commission receives notice of or initiates investigation of possible false statement or misrepresentation or concealment of material information whichever date is earlier. He shall thereafter suffer a penalty disqualification of the first 6 weeks for which benefits would otherwise be payable to him for any week within 52 weeks following his completion of restitution required under subsection (a) and in addition his maximum amount of benefits as provided in section 27(d) shall be reduced by an equivalent number of penalty disqualification weeks. The penalty disqualification does not apply to an individual who has been convicted under section 54 or any other criminal statute if prosecution thereunder was based upon a violation of the provisions of this act.

   Section 503(a) reads as follows:

   The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for—

   (1) Such methods of administration (including after January 1, 1940, methods relating to the establishment and maintenance of personnel standards on a merit basis, except that the Secretary of Labor shall exercise no authority with respect to the selection, tenure of office, and compensation of any individual employed in accordance with such methods) as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due; and . . .

   (3) Opportunity for a fair hearing before an impartial tribunal for all individuals whose claims for unemployment compensation are denied; and . . .

   Section 3304(a)(4) reads as follows:

   All money withdrawn from the unemployment fund of the State shall be used solely in the payment of unemployment compensation, exclusive of expense of administration, and for refunds of sums erroneously paid into such fund and refunds paid in accordance with the provisions of section 3305(b); except that—

   (A) an amount equal to the amount of employee payments into the unemployment fund of a State may be used in the payment of cash benefits to individuals with respect to their disability, exclusive of expenses of administration; and

   (B) the amounts specified by section 903(c)(2) of the Social Security Act may, subject to the conditions prescribed in such section, be used for expenses incurred by the State for administration of its unemployment compensation law and public employment offices;

subsequent to the completion of restitution of the monies which had been fraudulently obtained, he will be deemed ineligible for the first six weeks of the later benefit period.[2] Only the portion of the Statute relating to the six week future penalty is at issue.

There are no material issues of fact which have been presented to this Court. Although there has been an assertion that material disputes of fact exist—a position that has been maintained by Defendants since Plaintiffs' first Motion for Summary Judgment was denied on December 21, 1977 —they have failed to specifically identify any such material issues. During the oral argument on this Motion, Defendants acknowledged that there was no "material variation" in the facts as presented to the Court by Plaintiffs. For this reason, the Court will only briefly summarize the incidents which gave rise to this suit which was filed on December 13, 1974.

Plaintiff, Victor Arteaga, an auto worker, was laid off, but worked one day longer than his co-workers who were also laid off in 1969. As a result, he collected unemployment benefits and also received a "short-week" check from his employer for the same time period. Shortly thereafter, he received a MESC determination that $79.00 was due under Section 62(a) and that he would be subject to penalties under § 62(b).[3]

A restitution agreement was made and Arteaga, through a series of payments, reduced his balance from $79.00 to $36.00 at which time he was injured, thereby rendering him unable to work and unable to continue repayment. Six years later, Arteaga was laid off for a second time and, after two checks had been delivered to him, he was told to endorse current checks back to MESC in accord with the six week penalty of § 62(b). The first $36.00, which was returned to MESC by Arteaga, was applied to the balance due on the restitution account, and the remainder (approximately $600.00) was forfeited under § 62(b).[4]

The paper work and the legal arguments which have been generated by this case since 1974 have been awesome. Defendants Motion for Summary Judgment was denied

---

2. Before the 1974 and 1975 Amendments, § 62(b), in connection with the six week penalty, read:

He shall thereafter *forfeit* the first 6 weeks of *benefits which would otherwise be payable* to him for any week within 52 weeks following his completion of restitution required under subsection (a) of this section. (emphasis added)

After the 1974 Amendment, Pub.Act No. 104, and the 1975 Amendment, Pub.Act No. 272, the above sentence read:

He shall thereafter *suffer a penalty disqualification* of the first 6 weeks for which benefits would otherwise be payable to him for any week within 52 weeks following his completion of restitution required under subsection (a) and in addition his maximum amount of benefits as provided in section 27(d) shall be reduced by an equivalent number of penalty disqualification weeks.

As discussed, *infra*, the above word change is cosmetic only (reclassifying a "forfeiture of an item properly payable" to a previously determined "disqualification"). The only resultant procedural change is that, during the pre-amendment years, the claimant, subsequent to the receipt of an unemployment compensation check, was required to endorse it back to the Agency. Now, under the post-amendment procedures, no check is issued and the transaction is accomplished by bookkeeping entries. The

pragmatic effect (to wit, delay of benefits to unemployed workers to whom § 62(b) was previously applied) remains identical. *See* note 16, *infra* & accompanying text.

3. It is disputed whether Arteaga received notice of this determination. This Court is chagrined to learn that the issue of notice is still unresolved in administrative hearings after five years. *See* transcript of oral argument before this Court on September 26, 1980. Notably, in five contacts between Arteaga and MESC in the years 1969–1974, no mention of the six week forfeiture was made.

4. Plaintiff, Willie Conner, received an unearned $92.00 and acquiesced to the Appeal Board decision, believing that § 62(b) meant that only current year benefits were to be forfeited and without knowledge that a six week penalty may be imposed in the future. Conner alleges that he would have appealed or requested a rehearing from the Board if he had fully understood the consequences of the provisions.

Neither of the named Plaintiffs has been charged with any criminal violation of the Act, *see* Mich.Comp.Laws § 421.54(a). Where criminal prosecution is commenced, § 421.62(b) is inapplicable.

by Judge Guy in a bench ruling on January 26, 1977. A class comprised of "[A]ll those Michigan employees or former employees whom defendants have ruled or may rule to be subject to penalties under § 62(b) of the Michigan Employment Security Act (MESA) and whose 62(b) penalties had not yet been completely imposed at the time of filing of this lawsuit" was certified on March 17, 1977. On December 21, 1977, Plaintiffs' first Summary Judgment Motion was denied.

On April 3, 1979, a Partial Consent Judgment was entered which, at least prospectively, resolved Plaintiffs' contention that the forms, notices and procedures, which had been used by MESC to notify claimants that a determination of fraud had been made, unfairly emphasized the restitution and current year forfeiture aspects of § 62(b) while obscuring the six week later penalty consequence.[5] Defendant agreed to use redrafted forms and notices which clarified the six week penalty. At the same time, Plaintiffs withdrew their second Motion for Summary Judgment.

In the interim, extensive amicus briefs and numerous appearances have been filed by Chrysler Corporation, Ford Motor Company, Employers Unemployment Compensation Council, Center for Urban Law & Housing, and Michigan Legal Services.

It is well settled that this Court's duty is to examine statutory claims which may be dispositive before addressing the more difficult Constitutional issues which have been presented herein.[6] *See Hagans v. Lavine,*

415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974); *Rosado v. Wyman,* 397 U.S. 397, 402, 90 S.Ct. 1207, 1212, 25 L.Ed.2d 442 (1970); *Dandridge v. Williams,* 397 U.S. 471, 475–76, 90 S.Ct. 1153, 1156–57, 25 L.Ed.2d 491 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Harmon v. Brucker,* 355 U.S. 579, 581, 78 S.Ct. 433, 434, 2 L.Ed.2d 503 (1958).

The Court is acutely aware of its responsibility to maintain the fine distinction between statutory conflict and Constitutional impermissibility which, admittedly, is a difficult task when the concepts and terminology are intertwined and used interchangeably by the parties themselves. The only issue here, when narrowly addressed, is whether § 62(b), *Mich.Comp.Laws* § 421.- 62(b), on its face, impermissibly conflicts with § 303(a), 42 U.S.C. § 503(a) (1974), of Title III of the Social Security Act or with § 3304(a)(4), 26 U.S.C. § 3304(a)(4) (1979), of the Internal Revenue Code. The Court will confront this issue in two steps; first, it will explore the construction of the two statutes, and, second, it will determine whether the Michigan statute is invalid under the supremacy clause of the Constitution.

Plaintiffs contend that § 62(b) violates the purpose and requirements of the federal unemployment compensation statutes, irrespective of procedures which determine when it will be applied, how it is to be applied or against whom it is to be applied. There is no dispute as to what the Michigan statute means. The six week penalty is

---

**5.** (Complaint at 8, ¶¶ 36 A–D) It was Plaintiffs' contention that the failure of MESC to explain the six week penalty "lulled" claimants into a false security that the only penalties to be extracted would be the forfeiture of benefits for the current year and restitution of monies which had been improperly received. Notably, the MESC ruling, as attached to Plaintiffs' original Complaint, makes no reference to "forfeiture" or the six week penalty although it details other sanctions to be applied. Thus, without understanding that an additional forfeiture could be imposed many years in the future, claimants did not pursue their appellate or rehearing remedies. When the six week penalty was actually applied, MESC, citing § 62(e),

argued that claimants were time-barred from litigating the propriety of § 62(b).

**6.** Parenthetically, if Plaintiffs do not prevail on their statutory claims by Motion or at trial, a three judge court must be convened. It is of no consequence that this case has been addressed by three judges in this district *in seriatim. See Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 63–65, 99 S.Ct. 383, 386–387, 58 L.Ed.2d 292 (1978); *Hagans v. Lavine,* 415 U.S. 228, 544, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974); *see also Drumright v. Padzieski,* 436 F.Supp. 310 (E.D.Mich.1977). For a concise, albeit partisan, view of the Constitutional issues, *see Rossen, Unemployment Insurance,* 21 Wayne L.Rev. 705, 733–34 (1975).

imposed only if the claimant is laid off within a period of one year after completing restitution of the subject fraud. The second claim for benefits, from which the six week penalty is deducted, is unrelated to the earlier fraud except for the identity of the claimant and the fortuity of timing. Liability under the statute remains in perpetuity if the worker escapes a second layoff and never repays the monies which had been fraudulently acquired.

The statute mandates that the six week penalty be paid from benefits later due. There is no provision for the worker to "pre-pay" the six week penalty or its equivalent. Once subject to § 62(b), the worker can only pray that he/she can avoid being laid off during the fifty-two week period which follows his/her final restitution payment.

As pointed out, "[t]he statute allows no discretion based on the merits of the case, the magnitude of the fraud, the needs of dependents, payment of partial restitution, or even payment of full restitution within the year." *See* Plaintiff's Brief at 4. Fur-

ther, Defendants have not persuasively argued that the statute encourages restitution or deters fraud.[7]

The Supreme Court, in *California Department of Human Resources Development v. Java*, 402 U.S. 121, 130, 91 S.Ct. 1347, 1353, 28 L.Ed.2d 666 (1971), stated that the Congressional objective was "to provide a substitute for wages lost during a period of unemployment not the fault of the employee. Probably no program could be devised to make insurance payments available precisely on the nearest payday following the termination, but to the extent that this was administratively feasible this must be regarded as what Congress was trying to accomplish." The Court concluded that the word "due" means "the time when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions; any other construction would fail to meet the objective of early substitute compensation during unemployment."[8] *Id.* 133, 91 S.Ct. 1354.

---

7. *See Malek* deposition, vol. I, p. 35, describing the future penalty as "unfair, depending on circumstances" and transcript of oral argument on September 26, 1980 wherein Defendants' counsel conceded the harshness of the penalty, adding only that other fraud penalties may be more harsh. For a summary of MESC's experience with this statute as a prod for restitution, *see* Plaintiffs' Brief at 4, footnote. The Court, *sua sponte*, is skeptical that the provision deters fraud for many reasons. First, forms which were used prior to the date of the Partial Consent Judgment (April 3, 1979) did not explain the future penalty. Thus, it operated as a *post facto* punitive measure, not a pre-fraud deterrent. Second, the larger the fraud perpetrated by the claimant, the less likely that a six week default would recoup the full dollar amount which had been fraudulently procured. Third, it is unlikely that an individual who is predisposed to fraud, would rationally weigh or even consider the remote possibility of a second layoff. Also, it would be unreasonable to suppose that the laid-off worker would plan for the possibility of bleaker times years ahead. See also chart of hypothetical examples illustrating the unfairness/circumstance relationship, appended hereto as Appendix A.

8. Defendants seek to distinguish *Java* on the facts and to limit its reach by citing *Torres v. New York State Department of Labor*, 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972),

wherein the Court, in summary affirmance, held that a New York statute, which established a pretermination interview with the claimant, met the fair hearing standard.

First, since it is uncontroverted that Michigan is the only state which imposes a six week future disqualification, this is a case of first impression and all cited authority present different facts. However, the concern of the *Java* court that "when due" should be construed in light of Congressional intent, as well as the impatience of that Court with the State's circular argument that "nothing is due because we have determined nothing is due" is instructive, if not controlling, here.

Second, *Fusari v. Steinberg*, 419 U.S. 379, 388 n.15, 95 S.Ct. 533, 539, n.15, 42 L.Ed.2d 521 (1975) clearly rejects Defendants' second argument:

The District Court interpreted our summary affirmance in *Torres* to indicate that benefits are not "due" under § 303 until administratively deemed payable. While this is a plausible reading of the evolution and affirmance of *Torres*, it is not one that we can endorse. Such a definition of the "when due" requirement of federal law would leave little vitality to *Java* and would nullify the congressional intention of requiring prompt administrative provision of unemployment benefits.... We do not undertake to identify the combina-

*Java*, a unanimous and landmark decision, stated that the purpose of the "when due" requirement is threefold:

(1) To give prompt partial wage replacement so that the unemployed and their families would not be forced on relief; and

(2) To provide security to assist the wage earners in finding work; and

(3) To help stabilize industry by providing purchasing power to the unemployed when most needed.[9]

While this Court agrees with Defendant that "when due" is a matter of entitlement, as contrasted with need,[10] it will not dismiss the policy goals which were articulated by *Java* because they are stated in terms of economic needs. Of course, Congressional purpose cannot be read so broadly as to mandate payments whenever a claimant needs the funds and society needs to stabilize industry, to maintain consumer spending power, or to prevent temporarily unemployed individuals from seeking welfare assistance. Common sense dictates that the

broad purpose must be tempered by MESC's right, and responsibility, to mitigate claimant fraud. The stated policy goal of § 62(b) (to wit, "to discourage fraud") is undisputedly reasonable.[11]

Prevention of fraud is a proper objective in devising administrative methods to calculate when payments are due. However, there is nothing in the federal statutory language or in the case law which construes that statute to support the argument that the retroactive punishment for prior fraud is a legitimate factor to postpone the "when due" date of a current claim for benefits. All of the cases, which construe § 303(a)(1) in light of fair hearing and due process requirements, deal with procedural due process relevant to the then immediate claim for benefits, but not with a prior unrelated claim for benefits. Therefore, with the exception of the *Java* directive that underlying policy be given weight, the Court finds no guidance in prior case law, which is pertinent to the issues presented here.

---

tion of factors that justify the *Torres* decision. . . . We only indicate that the District Court should not have felt precluded from undertaking a more precise analysis of the statutory issue than it felt empowered to do in this case. (citations omitted)

At this juncture, it is unnecessary to consider the strict list of § 303 procedural requirements, including timely and adequate notice, effective opportunity to defend, right to confront, right to counsel, written findings, and impartial decision-maker, as set out at *Pregent v. New Hampshire*, 361 F.Supp. 782, 794 (D.N.H.1973), *vacated and remanded on issue of mootness, New Hampshire Dept. of Employment Security et al v. Pregent*, 417 U.S. 903, 94 S.Ct. 2595, 41 L.Ed.2d 207 (1975).

**9.** *See also* H.R.Rep.No. 615, 74th Cong., 1st Sess. 7 (1935); Hearings on H.R. 4120 Before the House Comm. on Ways and Means, 74th Cong., 1st Sess. 214 (1935); Statement of Federal Relief Administrator and Members of the Committee on Economic Security; Report of the Comm. on Economic Security: Hearings on S. 1130 Before the Senate Comm. on Finance 74th Cong., 1st Sess., 1321–1322 (1935); *Burtton v. Johnson*, 538 F.2d 765 (7th Cir. 1976).

**10.** Defendant reads the purpose of § 303(a)(1) as providing payments to unemployed persons who are "found to be eligible for and entitled to receive such benefits," thus distinguishing *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011,

25 L.Ed.2d 287 (1970), and its progeny of welfare-related cases which hold that an evidentiary hearing is required to meet the due process standard before benefits may be terminated. This distinction is supported by *Mathews v. Eldridge*, 424 U.S. 319, 340–341, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976).

**11.** The general purposes of the state employment security act are set forth at *Mich.Comp. Laws* § 421.2:

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten the burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this state. Social security requires protection against this hazard of our *economic life. . . . The systematic* accumulation of funds during periods of unemployment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of this state.

Plaintiffs make five major arguments in support of the proposition that the six week penalty is repugnant to § 303(a)(1) and request that this Court grant relief in the following manner:

(1) To declare the six week penalty void as violative of the Federal Social Security Act,

(2) To enjoin MESC from applying the six week penalty, and

(3) To order payment of benefits which were wrongfully withheld to members of the class certified in this action.

Only two of the arguments will be discussed here.[12] The remaining three arguments, contrary to the urging of Plaintiffs, sound in Constitutional law. The Court declines to reach these issues because both of the arguments which will be discussed, *supra*, when taken together or in the alternative, dispose of the matter at hand. Plaintiffs contend that the Michigan administrative methods which are activated by § 62(b) are not reasonably calculated to insure full payment of unemployment compensation when due, and that the § 62(b) penalty, whether characterized as a forfeiture or a disqualification, is *de facto* a prohibited attachment or an encumbrance on unemployment insurance otherwise due. The primary function of this Court is to decide whether § 62(b) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Perez v. Campbell*, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971), citing, *inter alia, Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

## I. ADMINISTRATIVE METHOD MUST BE REASONABLY CALCULATED TO INSURE FULL PAYMENT OF UNEMPLOYMENT COMPENSATION WHEN DUE

Defendants contend that § 62(b) does not violate the directive of 42 U.S.C. § 503(a)(1) which requires that state administrative methods must be calculated to insure full payment when it is due. They argue that when § 62(b) is imposed, claimant is determined to be *initially ineligible* for future benefits which may be otherwise payable. Therefore, nothing is due to an ineligible claimant. Initially, the simplicity of MESC's argument is enticing; however, the purposes of the federal statutory scheme control the extent to which a state agency may determine when a claimant is not entitled to any benefits.

■ We find that federal policy is contravened by an administrative determination, regardless as to how procedurally fair or correct the determination may have been, that a prior fraud shall be punished by a six week delay in eligibility for benefits attributable to a second lay-off. As Plaintiffs have reminded this Court, "the heart of any program for social security must be the child."[13]

This Court will not undertake to suggest to the State legislature what alternative remedies may be available to it for the deterrence or punishment of fraud. Mich. Comp.Laws § 421.54 provides for criminal prosecution. If it is true, as Defendants alleged during oral argument, that prosecu-

12. The three arguments of Plaintiffs which will not be discussed are as follows:

(1) The six week extra penalty that is taken out of benefits which are otherwise due, creates a constant pool of ineligible claimants or claimants whose eligibility will be delayed for six weeks. It thus conflicts with the purpose of both the state and federal unemployment insurance statutes which is salary replacement for the betterment of the entire State.

(2) The amount of the penalty served by the claimant is grossly arbitrary and in violation of the purpose of the federal act. The penalty, though served through chance ef-

fect, tends to fall most heavily on marginal employees who are more likely to be laid off within a year of final restitution.

(3) The arbitrariness and chance effect of the penalty, which is imposed without regard to either the amount that is gained by the alleged fraud or of the level of intent, denies benefits without fair hearing, contrary to 42 U.S.C. § 503(a)(3).

13. S.Rep. 628, 74th Cong., 1st Sess. 16 (1935), continuing, "Unemployment compensation . . . will benefit many children in the homes of unemployed workers. . . ."

tors are unwilling or are without resources to criminally prosecute under this provision, then, that too, is a matter for legislative remedy. Nevertheless, the laid-off worker, once subject to the six week delayed penalty of § 62(b), no matter how contrite, able or willing to pay for the transgression, is totally unable to amend for his past fraud.

The statute in controversy does not provide for administrative discretion, beyond the threshold decision of whether to prosecute initiate criminal proceedings, as to its application. Thus, to those individuals who are subject to § 62(b), it insures that full payment of unemployment compensation in connection with a current layoff will *not* be paid when due; instead, such current payment will be delayed for a period of six weeks as punishment for mishandling of a prior claim. The Court holds that the "when due" determination must be made solely in connection with the current application for benefits and cannot be colored by past acts.

## II. THE § 62(b) PENALTY, WHETHER CHARACTERIZED AS A FORFEITURE OR A DISQUALIFICATION, IS DE FACTO A PROHIBITED ATTACHMENT OR ENCUMBRANCE ON UNEMPLOYMENT INSURANCE OTHERWISE DUE

█ Given the Congressional intent and underlying policy, as discussed, *supra*, garnishment or attachment of unemployment insurance monies which are due the claim-

ant violates the purpose of the federal Act,[14] except in limited circumstances.

The rationale in welfare recoupment cases is that dependents should not be deprived or punished because of the fraud or mismanagement of the recipient. The same rationale is equally applicable to the case at bar.

Unquestionably, 26 U.S.C. § 3304(a)(4) precludes garnishment: "All money withdrawn from the unemployment fund of the State shall be used solely in the payment of unemployment compensation . . . ."

In 1974, the Department of Labor advised Defendants that their practice of requiring § 62(b) recipients to immediately endorse their check to the Agency violated 42 U.S.C. § 503(a)(5) and 26 U.S.C. § 3304(a)(4), stating that the endorsement-back procedure "would defeat the basic purpose of employment insurance, i. e., to provide an eligible employed worker with cash promptly in order that he may be able to meet his nondeferable expenses." [15]

In April of 1974, § 62(b) was amended as a result of advice from the Labor Department, but as Plaintiffs correctly argue, and Defendants admit, the substitution of the term "penalty disqualification" for the term "forfeiture" made no pragmatic difference.[16]

What is the difference then between an impermissible "forfeiture" and an allegedly permissible "penalty disqualification" if there is no difference in result? The Court

---

**14.** The Court accepts that the broad purpose of social security enactments is to put money into the hands of impoverished families so that they can buy food and other necessities. It is clear that prior debts cannot be used as set-offs except in those instances where the set-off is attributable to an overpayment which was received by the claimant during the same transaction. *See Hagans v. Lavine*, 415 U.S. at 539 n.6, 94 S.Ct. at 1380 n.6 (recoupment of illegally received welfare benefit is impermissible); *Gilles v. Department of Human Resources Development*, 11 Cal.3d 313, 113 Cal.Rptr. 374, 521 P.2d 110 (1974) (limited set-off against unemployment benefits is permissible).

**15.** *See* page 4 of letter from United States Department of Labor to the Director of the Michigan Employment Security Commission, Febru-

ary 8, 1974: "If the check is issued for the payment of compensation but is not unconditionally delivered to the claimant, we believe the procedure would be inconsistent with the requirements of sections 3304(a)(4), FUTA and 303(a)(5), SSA . . ." stating that the endorsement-back procedure "would defeat the basic purpose of unemployment insurance, i. e., to provide an eligible employed worker with cash promptly in order that he may be able to meet his nondeferable expenses."

**16.** *See* note 2, *supra*. *See also Malek* deposition, vol. 1, pp. 50–51, wherein Mr. Malek, MESC's Assistant Director, admits that the new version of the statute gives the "same result" as the pre-amendment statute.

is unsure. The duty of the Court to look beyond the terms which have been used in an effort to determine the substantive meaning is well documented. *See Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (impermissible to redesignate a *de facto* criminal penalty as civil in order to avoid stricter procedural safeguards); *United States v. Constantine,* 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. 233 (1935) ("special" tax imposed for violation of state laws not a tax, but a criminal penalty).

In 1903, the Supreme Court refused to accept appellant's argument that a levy on incoming goods was a "customs tax" and not a penalty, as contended by appellee. Finding that the levy was not imposed for revenue but for punishment and deterrence, the Supreme Court, in *Helwig v. United States,* 188 U.S. 605, 611, 23 S.Ct. 427, 429, 47 L.Ed. 614 (1903), said, "Whether the statute defines it in terms as a punishment or penalty is not important, if the nature of the provision itself be of that character."

The Court finds that the six week penalty disqualification is in reality an impermissible forfeiture based on past acts which are wholly unrelated to the claimant's instant application for unemployment benefits.

For the reasons as cited above, and others, the Court being fully advised in the premises;

IT IS ORDERED that Plaintiffs' Third Motion for Summary Judgment shall be, and is, granted, except as provided hereinbelow.

IT IS FURTHER ORDERED that the six week penalty provision in *Mich.Comp.Laws* § 421.62(b) shall be, and is, hereby declared void as being violative of 42 U.S.C. § 503(a)(1) and 26 U.S.C. § 3304(a)(5).

IT IS FURTHER ORDERED that no retroactive repayment of monies, that had been retained pursuant to § 62(b) shall be directed hereunder inasmuch as the federal policy, which has been outlined hereinabove, is primarily concerned with the timely payment of benefits to claimants.

(1) Each of the named individual Plaintiffs, Arteaga, Conner and Girgen shall be repaid forthwith any monies that had been obtained from them, pursuant to § 421.62(b) of the Michigan Compiled Laws,

(2) State courts and state agencies, although not directed to pay retroactive benefits, are not precluded from paying benefits to individual claimants pursuant to State law upon the receipt of an appropriate and timely request,

(3) Any case, in which a claim for benefits was filed after November 20, 1978 and before November 20, 1980, where (a) a § 421.62(b) penalty has been imposed, or (b) a final determination regarding § 421.62(b) liability has not been made, shall be reopened pursuant to State law if the claimant so requests.

IT IS FURTHER ORDERED that Plaintiffs shall be, and are, entitled to costs and reasonable attorney fees which were incurred in the above-entitled cause.

## APPENDIX A

EXAMPLES OF 62(b) PENALTY LOSSES SUFFERED BY HYPOTHETICAL WORKERS
FOUND TO HAVE INTENTIONALLY MISREPRESENTED AND SUBJECT
TO 62(b) PENALTIES IN AUGUST 1976 *

| Amount Gained by Misrep. | No. of Dependents | Restitution Made | Laid Off Again | Amount Lost Due to 62(b) Penalties (Not Including Restitution) | |
|---|---|---|---|---|---|
| 1. $95 | 6 | $95, Aug. 1976 | Dec. 1976, for 6 weeks | $816 | (6 × $136) |
| 2. $95 | 6 | None | Dec. 1976, for 6 weeks | $721 | [(5 × $136) + 41] ** |
| 3. $1088 | 4 | None | Not laid off | 0 | |
| 4. $136 | 4 | $5 | Dec. 1976, for 6 weeks | $685 | [(5 × $136) + $5] |
| 5. $95 | 0 | $95, Aug. 1976 | Dec. 1976, for 6 weeks . | $582 | (6 × $97) |

## APPENDIX A—Continued

EXAMPLES OF 62(b) PENALTY LOSSES SUFFERED BY HYPOTHETICAL WORKERS
FOUND TO HAVE INTENTIONALLY MISREPRESENTED AND SUBJECT
TO 62(b) PENALTIES IN AUGUST 1976 *

| | Amount Gained by Misrep. | No. of Dependents | Restitution Made | Laid Off Again | Amount Lost Due to 62(b) Penalties (Not Including Restitution) | |
|---|---|---|---|---|---|---|
| 6. | $95 | 4 | $95, Aug. 1976 | Sept. 1977, for 6 weeks | 0 | |
| 7. | $95 | 4 | $95, Aug. 1, 1976 | July 15, 1977, for 6 weeks | $272 | (2 × $136) |
| 8. | $300 | 3 | None | Dec. 1976, for 1 week | $102.40 | [$128 − (20% × $128)] |
| 9. | $1088 | 4 | $1088, Aug. 1976 | Sept. 1977, for 6 weeks | 0 | |
| 10. | $10 | 10 | $10, Aug. 1976 | Dec. 1976, for 6 months | $816 | (6 × $136) |

\* Worker is assumed to be back at work and requalified at maximum wage rate. Thus, penalties shown are just those due to the six-week provision. Clearly the effects of 62(b) can also vary enormously, up to a worker's whole entitlement, due to the cancellation of credit weeks in addition. Amounts based on benefit chart from MESC April 1976 MESA publication, page 31.

\*\* The $95 taken back as restitution is now spread over 5 weeks, but each of these weeks also still counts as a penalty week, so claimant loses 6 weeks of benefits minus the restitution, for (6 × $136) − $95 = $721 lost due to penalty.