Patrick C. English

v.

The **Board of Education of the Town of Boonton; *William L. Librera, Commissioner of the New Jersey Department of Education.**

**William L. Librera, Appellant.**

****The Board of Education of Lincoln Park, Intervenor.**

Nos. 01–3478, 01–3496 and 01–3505.

United States Court of Appeals, Third Circuit.

Argued: April 25, 2002

Filed: Aug. 2, 2002.

Patrick C. ENGLISH

v.

The **BOARD OF EDUCATION OF the TOWN OF BOONTON; *William L. Librera, Commissioner of the New Jersey Department of Education.**

**Board of Education of Town of Boonton, Appellant.**

****The Board of Education of Lincoln Park, Intervenor.**

* Pursuant to F.R.A.P. 43(c).

** Pursuant to the Court's Order dated 9/24/01.

Patrick C. English (Argued), Dines & English, Clifton, NJ, for Appellee.

Kevin Kovacs (Argued), Purcell, Ries, Shannon, Mulcahy & O'Neill, Crossroads Business Center, Bedminster, NJ, for Intervenor.

Jeffrey Speiser, Herbert J. Stern (Argued), Stern, Greenberg & Kilcullen, Roseland, NJ, for Appellant.

John J. Farmer, Jr., Attorney General of New Jersey, Nancy Kaplan, Assistant Attorney General, of Counsel, Howard J. McCoach, (Argued), Deputy Attorney General, Sarah G. Crowley, Deputy Attorney General, on the brief, Office of Attorney General of New Jersey, Richard J. Hughes, Justice Complex, Trenton, NJ, for Appellant.

Before: BECKER, Chief Judge,
SCIRICA and RENDELL, Circuit
Judges.

## OPINION OF THE COURT

BECKER, Chief Judge.

Lincoln Park is a New Jersey municipality that has elected to fulfill its statutory obligation to educate its high school students by entering into what is known as a "send-receive" relationship with neighboring Boonton through which it sends its pupils to Boonton High School and pays to the Boonton School District a tuition that reflects the "actual cost" of the students enrolled. N.J.S.A. § 18A:38–19. Under New Jersey's statute regulating send-receive relationships, N.J.S.A. § 18A:38–8.2, Lincoln Park is entitled to only one representative on the ten-member Boonton Board of Education ("Board"). Because Lincoln Park students constitute 52% of the Boonton High School population and Lincoln Park's population as a whole amounts to 56% of the combined populations of the two towns, the plaintiff, Patrick English, a resident of Lincoln Park, maintains that relegating Lincoln Park to only one vote on the Boonton Board deprives him of his constitutional right, under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, to proportional representation.

Upon cross-motions for summary judgment, the District Court agreed with English, and entered an order granting summary judgment against defendants the Boonton Board and the State Commissioner of Education. *See English v. Bd. of Educ. of Town of Boonton*, 135 F.Supp.2d 588 (D.N.J.2001) [hereinafter *"English I"*]. The Court ordered Lincoln Park's representation increased to four (out of thirteen), with the Lincoln Park delegation's vote on matters affecting the high school weighted by a factor that would give Lincoln Park influence on the Board congruent with its share of the high school population. *See English v. Bd. of Educ. of Town of Boonton*, 161 F.Supp.2d 344, 347–48 (D.N.J.2001) [hereinafter *"English II"*].

In reviewing the District Court's decision, we are called upon to consider the extent of the constitutional principle of "one person, one vote." Under this doctrine, "each qualified voter must be given an equal opportunity to participate in [an] election, and when members of an elected body are chosen from separate districts, each district must be established on a ba-

sis that will ensure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

Although requiring equality among eligible voters, "one person, one vote" jurisprudence recognizes that certain restrictions on voter eligibility are valid. In *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), the Supreme Court held "that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Id.* at 68–69. Such geography-based restrictions on the franchise have been upheld as valid when a municipality exercises "extraterritorial" powers over individuals outside its boundaries; the exercise of "extraterritorial" powers does not, according to *Holt*, require a "concomitant extraterritorial extension of the franchise." *Id.* at 69. Because valid geography-based restrictions on voting do not offend the principle of "one person, one vote," a court need not subject them to strict scrutiny; rather, the restrictions must only "bear some rational relationship to a legitimate state purpose." *Id.* at 70.

In our view, *Holt* mandates the conclusion that strict scrutiny does not apply and that Lincoln Park residents can claim no constitutional right to proportional representation on the Boonton Board. As is obvious, the residents of Lincoln Park do not reside within the geographic district that is responsible for electing the members of the Boonton Board; the Boonton Board, therefore, merely exercises extraterritorial power over Lincoln Park. Because Lincoln Park maintains its own separate board of education that controls the K–8 education of its students, this is not a case in which the Boonton School District

"exercis[es] precisely the same governmental powers over residents of surrounding ... territory as it does over those residing within its corporate limits." *Id.* at 72 n. 8. Rather, the Boonton Board is in a position to govern only four of thirteen years of a Lincoln Park student's public education, and thereby exercises limited extraterritorial powers.

Furthermore, under New Jersey's send-receive legislative scheme, it is possible that Lincoln Park may one day sever its send-receive relationship with Boonton. As a result, the residents of Lincoln Park cannot be said to possess the same stake as Boonton residents in Board decisions that affect the Boonton School District in the long term, such as capital improvements. At bottom, we conclude that the New Jersey send-receive scheme as applied to Lincoln Park does not violate the principle of "one person, one vote."

English maintains, however, that even if we decline to review the Lincoln Park–Boonton arrangement under strict scrutiny, the statutory scheme's allocation of only one vote to Lincoln Park does not survive even the more deferential rational basis review. We disagree, for we think that the allocation to Lincoln Park of only one representative on the Boonton Board, the type of complex judgment that a state legislature is entitled to make, does, in fact, "bear some rational relationship to a legitimate state purpose." *Id.* at 70. Accordingly, we will reverse the order of the District Court and remand with directions to grant summary judgment to the defendants.

## I. Facts and Procedural History

Under New Jersey law, Lincoln Park has an obligation to educate, at its own expense, all persons, between the ages of five and twenty who are domiciled within the district. N.J.S.A. § 18A:38–1. New Jersey law, however, does not require that

Lincoln Park construct and maintain its own schools in order to fulfill this obligation. Rather, Lincoln Park, like any New Jersey school district, may enter into a send-receive relationship with another district whereby it sends its pupils to the receiving district's schools for one grade or more, N.J.S.A. § 18A:38–8, in return for a tuition payment that does not exceed the "actual cost" of the students enrolled, N.J.S.A. § 18A:38–19, with "actual cost" defined in detail by the New Jersey Administrative Code. *See* N.J.Admin.Code § 6A:23–3.1.

Over fifty years ago, rather than build its own high school, Lincoln Park elected to enter into a send-receive relationship with neighboring Boonton for the education of its high school students, and that relationship has continued to the present day. Although the Lincoln Park–Boonton relationship has persisted for more than half a century, it has not been without its share of acrimony, as there have been at least four major lawsuits between the districts on topics ranging from the Lincoln Park representative's right to receive information to overcharging of tuition to Lincoln Park. *See English I*, 135 F.Supp.2d at 591.

According to New Jersey law, when a sending district's students "comprise less than 10 percent of the total enrollment of the pupils in the grades of the receiving district in which the pupils of the sending district will be enrolled, the sending district shall have no representation on the receiving board of education." N.J.S.A. § 18A:38–8.2(a)(1). When, however, the sending district's pupils "comprise at least 10 percent of the total enrollment of the pupils in the grades of the receiving district in which the pupils of the sending district will be enrolled," the sending district's board of education is entitled to appoint one member to serve on the receiving district's board. N.J.S.A. § 18A:38–8.2(a)(2). The level of representation of the sending district remains fixed at one representative regardless of whether students from the sending district constitute 10 % or 90 % of the relevant population of the receiving district's schools. As a result of a political compromise, the state legislature has carved out one exception to this rule, which is explained in the margin.[1]

As noted above, for the 2001–02 school year, Lincoln Park provided 52 % of the high school's combined student population. Additionally, according to the most recent census data, Lincoln Park's total population amounts to 56 % of the combined population of the two towns but, despite its larger population, Lincoln Park, as per N.J.S.A. § 18A:38–8.2, is entitled to only one representative on the Boonton Board. Moreover, state law limits the vote of the Lincoln Park representative on the Boonton Board to the following issues:

1. New Jersey law provides that sending districts in "sixth class" counties—counties bordering the Atlantic Ocean that have a population of less than 125,000, *see* N.J.S.A. § 40A:6–1—which have "resident enrollment greater than 2,400 pupils but less than 2,600 pupils and which send[ ] its pupils in grades 9 through 12 to a school district in the same county pursuant to N.J.S.A. 18A:38–8 [the send-receive provision]," are entitled to up to three representatives on the receiving district's board if students from the sending district make up at least 40 % of the total enrollment of grades 9 through 12. N.J.S.A.

§ 18A:38–8.4. As the anomalous nature of this provision suggests, this exception was adopted to benefit one particular sending school district, Upper Township. The legislative history indicates that the provision was passed in order to effectuate an agreement between Upper Township and the receiving district, Ocean City, by which the two agreed to increase Upper Township's representation on Ocean City's school board from one to three representatives. *See* S.Doc. No. 2212, 208th Sess., at 3 (N.J.1999); A.Doc. No. 3499, 208th Sess., at 3 (N.J.1999).

a. Tuition to be charged the sending district by the receiving district and the bill lists or contracts for the purchase, operation or maintenance of facilities, equipment and instructional materials to be used in the education of the pupils of the sending district;

b. New capital construction to be utilized by sending district pupils;

c. Appointment, transfer or removal of teaching staff members providing services to pupils of the sending district, including any teaching staff member who is a member of the receiving district's central administrative staff; and

d. Addition or deletion of curricular and extracurricular programs involving pupils of the sending district.

N.J.S.A. § 18A:38-8.1.

State law mandates that neither the sending nor the receiving district may sever its send-receive relationship without the approval of the State's Commissioner of Education ("Commissioner"). N.J.S.A. § 18A:38-13. To obtain approval, the district seeking to withdraw from the relationship must submit a feasibility study addressing the educational and financial implications of severance and the effect on the racial composition of the student population of each of the districts. *Id.* If the Commissioner concludes that "no substantial negative impact" will result from the severance, he or she "shall grant" the severance. *Id.* Despite the grievances of some of its residents, Lincoln Park has apparently never officially sought to withdraw from its send-receive relationship with Boonton.[2]

Plaintiff Patrick English, a resident of Lincoln Park, brought suit in the District Court for the District of New Jersey against the Boonton Board and the Commissioner of the New Jersey Department of Education. Although not an original

---

**2.** Although this case concerns a send-receive relationship, it is worth noting that there is another option by which two municipalities can pool educational resources under New Jersey law: the formation of a "regional" school district. *See* 18A:13-1 *et seq.* A "regional" school district can be either "all purpose," which means that it is responsible for which educating students of all ages within the district, or "limited purpose," means that it is responsible for educating students of certain grade levels only. *See* N.J.S.A. § 18A:13-2. Limited purpose regional districts are often formed to provide high school facilities for the children of two or more towns that do not have high schools of their own. In such instances, residents of the towns making up the regional district will vote for two school boards—one for their municipality's own K–8 district, and another for the regional school district, which would govern only high school affairs.

Funding for regional school districts is apportioned on the basis of relative municipal property values, pupil enrollments from each municipality, or a combination thereof. *See* N.J.S.A. § 18A:13-23. As for governance, New Jersey law requires that a regional school board consist of nine members, and that each town within the regional district have at least one representative on the board. *See* N.J.S.A. § 18A:13-8. If there are less than nine towns in the district, the extra seats on the board are distributed on the basis of population. *See id.* Like the send-receive representation scheme at issue in the case at bar, the regional district representation scheme has also been attacked as a violation of the "one person, one vote" doctrine in instances where a constituent municipality receives less representation on the regional school board than it would receive if representation were apportioned on the basis of population alone. *See, e.g., Township of Marlboro v. Bd. of Educ. of Freehold Reg'l High Sch.*, 992 F.Supp. 756 (D.N.J.1998) (finding "one person, one vote" violation where town that made up 20 % of the regional district's combined population received only one vote on nine-person regional school board).

plaintiff, the Lincoln Park School Board was permitted by the District Court to intervene in the litigation on English's behalf.[3] The plaintiffs alleged that N.J.S.A. § 18A:38–8.2's allocation of one representative to a sending district on the receiving district's board was unconstitutional as applied because it deprived English and other residents of Lincoln Park of their right to proportional representation. Upon cross-motions for summary judgment, the District Court granted summary judgment for the plaintiffs, concluding that the constitutional principle of "one person, one vote" had been violated by N.J.S.A. § 18A:38–8.2 as applied to Lincoln Park. *English I*, 135 F.Supp.2d at 594. The Court explicitly noted that it was not striking down the statute as unconstitutional on its face, for it noted that in some instances the statute's allocation of one vote to a sending district might result in representation that comports with the "one person, one vote" principle. *Id.* at n. 9.

. As an interim remedy for the constitutional violation (the Court made clear its belief that it was for the state legislature to fashion a long-term solution), the Court ordered that Lincoln Park's representation on the Boonton Board be increased from one representative (out of ten) to four (out of thirteen). *English II*, 161 F.Supp.2d at

347. Moreover, for the matters enumerated in § 18A:38–8.1 that relate only to high school affairs (i.e., not matters that concern the school district as a whole such as the selection of members of the district's central administrative staff), the Court ordered that the vote of the Lincoln Park delegation be weighted by a factor of 2.5, which would have the effect of giving the Lincoln Park representatives control over 52.6 % of the vote, a number which the District Court thought would "achieve, as nearly as practicable, representation proportionate to Lincoln Park and Boonton's respective proportion of the combined population of the two districts." *Id.* at 347–48. With respect to the matters enumerated in § 18A:38–8.1 that do have a district-wide impact, the Court ordered that the Lincoln Park representatives' votes be weighted by a factor of 0.7, which would bring the Lincoln Park representation to "approximately 23%," a figure that represents the proportion of total students in the Boonton School District who are from Lincoln Park. *Id.* at 348. The defendants have appealed both the District Court's declaration of N.J.S.A. § 18A:38–8.2 as unconstitutional as well as the Court's remedy.

■ This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291.[4] Our review of a

---

**3.** For the sake of simplicity, we will refer to the individual plaintiff—English—and the intervening Lincoln Park School Board collectively as "the plaintiffs," even though the latter is not, strictly speaking, a "plaintiff" in this litigation.

**4.** The Boonton Board has argued that we have no jurisdiction over this case because the plaintiff's claims are not yet ripe. Because the Lincoln Park School Board has never officially sought to withdraw from its relationship with Boonton, the Boonton Board maintains that Lincoln Park must first exhaust its administrative remedies—seeking severance through the Commissioner's office as per N.J.S.A. § 18A:38—13—before this suit

can proceed. We disagree. This lawsuit has not been brought by the Lincoln Park School Board (although the Board has intervened on behalf of the plaintiff), but rather by a resident of Lincoln Park suing in his individual capacity. As an individual, English has no power to seek severance of the Lincoln Park–Boonton relationship. Moreover, while English's suit certainly has consequences for all of Lincoln Park's residents, the suit is, at its core, a claim to vindicate not the collective rights of Lincoln Park residents, but the *individual's* right under the Equal Protection Clause to "one person, one vote." *See Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) ("The rights created by the first section of the Fourteenth Amendment

district court's grant of summary judgment is plenary. *See Beers–Capitol v. Whetzel*, 256 F.3d 120, 130 n. 6 (3d Cir. 2001). Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *See* F.R.C.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. Discussion

### A. The Constitutional Principle of "One Person, One Vote"

The history of the Fourteenth Amendment's "one person, one vote" doctrine begins with *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), where the Supreme Court rejected the long-held notion that questions of legislative apportionment were political questions outside the purview of the judiciary. *Baker* paved the way for a series of successful "one person, one vote" challenges to state and local elective systems, including the elections of state legislators, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), county officials, *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), members of a local school board, *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and trustees of a community college, *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

 The "one person, one vote" principle requires that "each qualified voter must be given an equal opportunity to participate in th[e] election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will ensure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." *Id.* at 56. When a challenged elective system denies an equal voice to each resident, the scheme is reviewed under strict scrutiny, for "the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable." *Kramer*, 395 U.S. at 627–28.[5]

While proclaiming the importance of the "one person, one vote" right, the Supreme

are, by its terms, guaranteed to the *individual*. The rights established are *personal* rights.") (emphases added). In other words, even if the Lincoln Park School Board were entirely content with the terms of its send-receive relationship with Boonton (which, apparently, it is not, as evidenced by its intervention on English's behalf), English would still be entitled to bring suit to vindicate his individual rights as a voter. *See, e.g., Baker v. Reg'l High Sch. Dist. No. 5*, 520 F.2d 799 (2d Cir.1975) (court heard suit of individual resident alleging violation of "one person, one vote" principle despite fact that the district in which the plaintiff resided had consented to the joint board of education's representation scheme).

**5.** An exception to this rule has been recognized in the case of the election of "certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election ... might not be required." *Hadley*, 397 U.S. at 56. In such "special interest elections," "the State may constitutionally disenfranchise residents who lack the required special interest in the subject matter of the election." *Holt*, 439 U.S. at 69. For instance, the Supreme Court upheld a scheme that apportioned votes for the members of a water storage district board not on a "one person, one vote" basis, but rather on the basis of the value of property owned. *See Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). The Court has also expressly left open the question of whether school board elections can be limited to a subset of a school district's general population that is "primarily interested in school affairs." *Kramer*, 395 U.S. at 632.

Court has also recognized that this right must operate within certain geographic boundaries. Obviously, it does not violate the principle of "one person, one vote" when residents of Idaho are denied the right to vote for the governor of New Jersey. Nor does it violate "one person, one vote" when the residents of Philadelphia, Pennsylvania's suburbs are denied the right to vote for the Mayor or City Council of Philadelphia, despite the fact that many decisions of the Philadelphia city government—such as those regarding taxes, transportation, parking, and cultural institutions—"inescapably affect individuals living immediately outside [Philadelphia's] borders," particularly those who work within the city limits. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 69, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). The Supreme Court has recognized, therefore, "that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders," despite the fact that a government unit's decisions may inevitably have an effect—sometimes a very large effect—on persons who reside outside the unit's geographic limits. *Id.* at 68–69.

## B. *Holt* and the Validity of Geographical Restrictions on the Franchise

In *Holt*, the Supreme Court expressly recognized geographical limits on the "one person, one vote" principle. There the Court addressed the constitutionality of an Alabama statute that subjected Holt, an unincorporated community on the outskirts of the city of Tuscaloosa, to the city's "police jurisdiction," which meant that Holt was subject to Tuscaloosa's police and sanitary regulations and the criminal jurisdiction of Tuscaloosa's courts, as well as the city's power to license businesses, trades, and professions. Despite Tuscaloosa's exercise of "police jurisdic-

tion" over Holt, the statute did not entitle Holt residents to vote in Tuscaloosa elections, an exclusion which was challenged as a violation of "one person, one vote."

In concluding that the scheme was constitutional, the Court distinguished prior cases in which a violation of the "one person, one vote" principle had been found as those where the franchise had been denied "to individuals who were physically resident within the geographic boundaries of the governmental entity concerned." *Id.* at 68. The court held that, because Holt residents lived outside the boundaries of Tuscaloosa, the governmental unit at issue, "one person, one vote" was not implicated and the scheme needed to survive only rational basis review to be upheld. Applying rational basis review, the Court concluded that the scheme bore "some rational relationship to a legitimate state purpose," *id.* at 70, and upheld Tuscaloosa's extraterritorial exercise of municipal powers over Holt. *Id.* at 74–75.

■ The defendants contend that this case is controlled by *Holt* because English and the other residents of Lincoln Park, like the residents of Holt, reside outside "the geographic borders of the governmental entity concerned"—the Boonton School District. *Id.* at 68. Consequently, the defendants submit, although Lincoln Park residents, like the residents of Holt, are subject to the extraterritorial jurisdiction of another municipal entity—specifically, the Boonton Board's control over their children's high school education—they are not entitled to a proportionate vote in that entity's elections. Thus, the defendants argue, the principle of "one person, one vote" is not offended, and the state need not justify its representation scheme under strict scrutiny. *See Mixon v. Ohio*, 193 F.3d 389, 402 (6th Cir.1999) (noting that when legislation "does not infringe on the

right to vote, we examine the challenged statute under the rational basis standard").

The plaintiffs counter that the Supreme Court's holding in *Holt* is limited to instances in which a municipality exercises only "limited" extraterritorial power over non-residents. They submit that where a municipality exercises extensive powers over non-residents, as they contend is the case here, political subdivisions are mere formalities that ought not to stand in the way of the vindication of federal constitutional rights, and, accordingly, the franchise must be extended extraterritorially to non-residents whose interests are affected by the decisions of another governmental entity.

The plaintiffs rely on a 1975 decision of the United States Court of Appeals for the Eighth Circuit, *Little Thunder v. South Dakota*, 518 F.2d 1253 (8th Cir.1975). There the Court was called upon to review the constitutionality of a South Dakota statutory scheme under which residents of the state's "unorganized" counties were excluded from participating in the elections of "organized" county officials who nevertheless wielded the same powers over the "unorganized" counties as they did over the "organized" counties that elected them. *Id.* at 1254–55. Although South Dakota argued that the non-residents' exclusion was justified as a legitimate geographic residency requirement, the Court of Appeals rejected this view as "too simplistic." *Id.* While the Court recognized a state's prerogative to impose geographic limits on the franchise, it cautioned that "those limits must bear a close relationship to the underlying interests of the parties affected in the results of the elective process." *Id.* at 1256. Because the "unorganized"/"organized" county residence distinction in

voting rights did not "result from a substantial difference in the[ ] interests [of the residents of each type of county] in the election of county officials," the Court held that the scheme was an unconstitutional violation of the "one person, one vote" principle. *Id.*

We agree with the plaintiffs and the Eighth Circuit that a rigidly formalistic approach to geography in "one person, one vote" jurisprudence would be "too simplistic," as it may result in upholding "entirely arbitrary" or "irrational[ ]" distinctions in citizens' voting rights, *Holt*, 439 U.S. at 87 (Brennan, J., dissenting). Although the *Holt* Court at times seemed to endorse unequivocally the validity of geographic restrictions on the franchise, *see id.* at 68–69 ("[O]ur cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders."), the Court acknowledged that in "a situation in which a city has annexed outlying territory in all but name, and is exercising precisely the same governmental powers over residents of the surrounding ... territory as it does over those residing within its corporate limits," constitutional problems may well arise where the residents of the outlying territory have no say in the election of the city's officials. *Id.* at 72 n. 8 (citing *Little Thunder*). Moreover, the Court took care to observe that although the interests of Holt residents were undoubtedly affected to a large degree by the powers exercised by Tuscaloosa's city government, Tuscaloosa's powers over Holt did not include certain "vital and traditional authorities of cities and towns," such as zoning, the power to levy ad valorem taxes, and eminent domain. *Id.* at 72 n. 8.[6]

---

6. Justice Stevens elaborated on this point in his concurring opinion by noting the "limited" nature of the extraterritorial powers exer-

cised by Tuscaloosa. *Holt*, 439 U.S. at 77. Moreover, Justice Stevens noted that even though Holt residents could not vote in Tusca-

However, even assuming that *Little Thunder* is apposite (in fact we think it factually distinguishable), the plaintiffs do not acknowledge the extent to which the Supreme Court's opinion in *Holt*, issued three years after *Little Thunder*, cut back on the Eighth Circuit's analytical technique of taking non-residents' "interests" into account. In particular, whereas the *Little Thunder* Court seemed to conclude that residency requirements are permissible only "when they are designed to insure that only voters who have a substantial interest in the outcome of elections will participate," 518 F.2d at 1256, the Supreme Court in *Holt* recognized that territorial restrictions on the franchise may be valid even where the decisions of a municipality have a "heav[y] impact" on non-residents excluded from its political processes. 439 U.S. at 69–70.

It seems to us, therefore, that the Court in *Holt* took care to eschew a rigidly formalistic reliance on geography in assessing the constitutionality of a territorial voting restriction, but at the same time required that something more than what the *Little Thunder* Court termed the "substantial interest[s]" of the non-residents to have been affected for a territorial restriction to violate the principle of "one person, one vote." We read *Holt* as meaning that strict scrutiny will be applied to the exclusion of non-residents from the elections of a particular governmental entity only when that unit of government exercises a level of control over the non-residents' lives close to or equal to that which it exercises over those who actually reside within its borders. However, the mere fact that a municipality's actions may have an impact—even a substantial impact—on non-residents does not entitle those non-residents to vote in the municipality's elec-

tions. *See Holt*, 439 U.S. at 69–70 (noting that despite the fact that a city's decisions may have "dramatic extraterritorial effects" on non-residents, those non-residents are not entitled to vote in the city's elections).

Applying this tempered view of *Holt*, we are constrained to hold that the residents of Lincoln Park have no right to vote in the election of Boonton's School Board. This is not a case in which the Boonton Board "exercis[es] precisely the same governmental powers over residents of [Lincoln Park] as it does over those residing within its [district's] limits." *Id.* at 72 n. 8. Lincoln Park residents are subject to the extraterritorial powers of the Boonton Board only with respect to their high school-aged children. For matters concerning K–8 education, the residents of Lincoln Park exercise exclusive control through their own school board elected solely by Lincoln Park residents. Moreover, the Boonton Board's control over high school education is only one of its many responsibilities affecting the residents of Boonton. The Board is also responsible for the district's K–8 educational program, as well as matters that affect the district as a whole, such as school facilities and the district's central administrative staff.

The plaintiffs contend that *Holt* is distinguishable because this case concerns education, "a vital government function," *Hadley*, 397 U.S. at 56, whereas Holt involved less important governmental services like police protection and business licensing. *See Holt*, 439 U.S. at 77 (Stevens, J., concurring) (noting that the extraterritorial powers of Tuscaloosa over the residents of Holt were "limited" in part because Tuscaloosa exercised no power over Holt's schools). While we do not gainsay that

loosa's municipal elections, they were entitled to vote for county officials, and were thereby

"not without any voice in the election of the officials who govern their affairs." *Id.* at 77.

education is a governmental function of the utmost importance, *see Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (noting that "education is perhaps the most important function of state and local governments"), we doubt the viability of that distinction in this context. At all events, we think that the extraterritorial power over education exercised by the Boonton Board is itself "limited" for the reasons described above: the Boonton Board controls only four of the thirteen years of a Lincoln Park child's education and Lincoln Park possesses its own school board elected exclusively by Lincoln Park residents for the governance of K–8 affairs. Moreover, Lincoln Park residents are not without any voice in the governance of Boonton High, for state law, as explained above, entitles the Lincoln Park Board to appoint a representative to the Boonton Board. That person may speak at Board meetings to convey Lincoln Park's view. He or she also has a vote on matters that primarily affect the high school. *See* N.J.S.A. § 18A:38–8.1.

Additionally, New Jersey has legitimate reasons for limiting the representation of Lincoln Park in the Boonton Board's decisions. As noted above, under New Jersey law there is always the possibility that Lincoln Park, as a sending district, might sever its relationship with Boonton. *See* N.J.S.A. § 18A:38–13. As a result, it can fairly be said that Lincoln Park residents do not have the same vested interest in the long-term affairs of the Boonton school district—such as capital improvements, employee pension plans, and other long-term commitments—as do Boonton residents. Moreover, as discussed earlier, some of the items on which a sending district's representative is entitled to vote affect more than just the school that the district's students attend. *See, e.g.,* N.J.S.A. § 18A:38–8.1(d) (selection "of the receiving district's central administrative staff"). It makes sense, therefore, for New Jersey to limit the power of the sending district's representative so as to preserve the receiving district's control over matters that affect the school district as a whole.

Perhaps in an ideal system of government, the residents of Lincoln Park would be entitled to a level of representation on the Boonton Board that is exactly proportional to their level of "interest" in the Board's functions, if such a figure could be calculated. Indeed, the District Court, through its remedy's mathematical formula for determining different levels of representation for Lincoln Park as to different issues addressed by the Boonton Board, appears to have attempted to achieve such precision. The Constitution, however, does not require that a system of government be "the soundest or most practical form of internal government possible" from "a political science standpoint." *Holt*, 439 U.S. at 73–74. Rather, imprecision in democratic representation is tolerated, so long as the basic principles of "one person, one vote," described above, are not offended.

While well-intentioned, the District Court's remedy has the potential to involve the judiciary in what is an essentially legislative role. The complex policy decisions involved in apportioning representation where a school board exercises limited power over students from another district and where the relationship between a sending and receiving district is far from permanent are decisions best left to a legislature. *See Reynolds*, 377 U.S. at 620–625 (Harlan, J., dissenting) (arguing that questions of democratic apportionment are best left to the legislature). This is especially so in the context of education policy, an area in which the Supreme Court has repeatedly admonished the judiciary to be wary of intervention. As the Court ob-

served in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973):

> Education ... presents a myriad of intractable economic, social, and even philosophical problems. The very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that, within the limits of rationality, the legislature's efforts to tackle the problems should be entitled to respect.... In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.

*Id.* at 42–43 (internal quotation marks and citations omitted).

Indeed, the very complexity of the District Court's remedy illustrates why intervention in this area is better suited to the state legislature than to the judiciary. Under the Court's remedy, as discussed above, four members of the Lincoln Park Board would be entitled to sit on a thirteen-member Boonton Board with the votes of the Lincoln Park delegation weighted by a factor of 2.5 in matters affecting only the high school and 0.7 in matters affecting the district as a whole. This remedy threatens to make a math lesson out of every meeting of the Boonton Board. While the Court proffered its remedy as only an interim solution pending action by the New Jersey state legislature (which is something that the Court could neither compel nor, with any degree of confidence, expect), the rationale of the Court's opinion and its remedy—which seem to require that Lincoln Park's representation on the Boonton Board comport almost exactly to its share of the student population—appear to leave the state legislature little room within which to maneuver.

For all of these reasons, we are satisfied that N.J.S.A. § 18A:38–8.2 as applied to Lincoln Park does not violate the principle of "one person, one vote." Consequently, we need not review the statute under strict scrutiny.[7]

---

7. In urging us to reverse the District Court, the defendants stressed in their briefs and at oral argument what they describe as the "voluntary" nature of the Lincoln Park–Boonton relationship. By "voluntarily" deciding to enter the send-receive relationship with Boonton, the defendants claim, Lincoln Park cannot now claim to be dissatisfied with the terms of the send-receive agreement, for Lincoln Park residents have made the decision that they would rather send their children to another district's high school and pay tuition than build a high school of their own, even if this arrangement means that some degree of autonomy over their children's high school education will be sacrificed.

We are satisfied that there has been no violation of "one person, one vote" for the reasons stated in the text, and do not rely on the defendants' "voluntariness" argument. This argument, like the defendants' argument regarding ripeness, *see supra* note 4, confuses the collective nature of action taken by the Lincoln Park School Board with the *individual* right asserted by English in this litigation. The case law on "one person, one vote" makes clear that English's equal protection rights may not be sacrificed merely because a majority of his fellow citizens have consented to sacrifice their own rights. *See Lucas v. Forty-Fourth Gen. Assembly of Colo.*, 377 U.S. 713, 736–37, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) ("An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate....") ("A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be."); *see also Holt*, 439 U.S. at 76 (Stevens, J., concurring) (noting that neither a municipality nor a state "can consent to a waiver of the constitutional rights of its con-

## C. Rational Basis Review

■ Having concluded that the principle of "one person, one vote" is not offended, we must ask only whether N.J.S.A. § 18A:38–8.2 as applied to Lincoln Park "bear[s] some rational relationship to a legitimate state purpose." *Holt*, 439 U.S. at 70. "Rational relationship" review is, of course, a very deferential standard, under which "a law will be sustained ... even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). So long as strict scrutiny is not implicated, states enjoy significant latitude in the design of local governments, for "the Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local governments." *Avery*, 390 U.S. at 485. Indeed, this deference to state legislative judgment is particularly appropriate in the realm of educational policy, where, as noted, "[t]he very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect." *Rodriguez*, 411 U.S. at 42 (quoting *Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972)).

■ Applying this deferential standard of review, we conclude that the application of N.J.S.A. § 18A:38–8.2 to Lincoln Park is not irrational. In allocating one representative to sending districts that provide more than 10 % of a receiving school's population, New Jersey seeks to allow a sending district some voice—but only a modest voice—in the receiving district's affairs. For the reasons described above, New Jersey has legitimate reasons for limiting the input of a sending district in the receiving district's board's decisions. As discussed, a sending district, at least in theory, may at some point sever its relationship with the receiving district. Consequently, Lincoln Park's residents do not have the same vested interest in the long-term affairs of the Boonton school district as do Boonton residents. Moreover, as we earlier observed, some of the items on which a sending district's representative is entitled to vote affect more than just the school its district's students attend. *See, e.g.*, N.J.S.A. § 18A:38–8.1(d) (selection "of the receiving district's central administrative staff"). In sum, we do not consider it irrational for New Jersey to limit the power of the sending district's representative so as to preserve the receiving district's control over matters that affect the school district as a whole.

We recognize that under N.J.S.A. § 18A:38–8.2, a sending district that provides 90 % of the students in particular grades of a receiving district will be entitled to the same number of representatives on the receiving district's school board—one—as a sending district that provides only 10 % of the students at particular levels. However, the mere fact that N.J.S.A. § 18A:38–8.2's representation scheme might have been crafted with more precision "[f]rom a political science standpoint" does not mean that the current system is irrational, for "this Court does

---

stituents in the election process"); *Baker v. Reg'l High Sch. Dist.*, 520 F.2d 799 (2d Cir. 1975) (finding violation of "one person, one vote" principle despite fact that the district in which the plaintiff resided had consented to

the joint board of education's representation scheme); *Barnes v. Bd. of Dirs.*, 418 F.Supp. 845 (D.Vt.1978) (same); *Leopold v. Young*, 340 F.Supp. 1014 (D.Vt.1972) (same).

not sit to determine whether [New Jersey] has chosen the soundest or most practical form of internal government possible." 439 U.S. at 73–74. Rather, because we conclude that the New Jersey send-receive representation scheme "bear[s] some rational relationship to a legitimate state purpose," we will uphold it as applied to Lincoln Park. *Id.* at 70; *accord Hawkins v. Johanns*, 88 F.Supp.2d 1027 (D.Neb. 2000) (upholding similar send-receive scheme under rational basis review despite fact that sending district received no representation on the receiving district's school board).

For the foregoing reasons we will reverse the order of the District Court granting summary judgment to the plaintiff, and remand with directions that the Court grant the defendants' cross-motions for summary judgment.

